[No. S078879. Apr. 2, 2001.]

In re HUGO RANGEL RESENDIZ on Habeas Corpus.

**COUNSEL**

Cynthia M. Sorman and Michelle C. Rogers, under appointments by the Supreme Court; and Richard L. Waldron for Petitioner Hugo Rangel Resendiz.

Law Offices of Norton Tooby and Norton Tooby for California Attorneys for Criminal Justice, California Rural Legal Assistance Foundation, Central American Resource Center, Coalition for Humane Immigrant Rights and Immigrant Legal Resource Center as Amici Curiae on behalf of Petitioner Hugo Rangel Resendiz.

John Philipsborn for California Attorneys for Criminal Justice as Amicus Curiae on behalf of Petitioner Hugo Rangel Resendiz.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Gary W. Schons, Assistant Attorney General, Esteban Hernandez, Janelle M. Boustany, Raquel M. Gonzales and Garrett Beaumont, Deputy Attorneys General, for Respondent State of California.

Thomas J. Orloff, District Attorney (Alameda), William M. Baldwin, Assistant District Attorney, and Jeff H. Rubin, Deputy District Attorney, for Appellate Committee of the California District Attorney's Association as Amicus Curiae on behalf of Respondent State of California.

## OPINION

**WERDEGAR, J.**—The question presented is whether petitioner, in deciding to plead guilty to certain offenses for which he now faces deportation, received ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution or article I, section 15 of the California Constitution. The Court of Appeal answered in the affirmative. The Attorney General urges that we adopt a categorical rule barring ineffective assistance claims based on advice concerning the immigration consequences of a guilty plea. As explained below, we conclude that affirmative misadvice regarding immigration consequences may, depending on the circumstances of the particular case, constitute ineffective assistance of counsel. Nevertheless, as we agree with the Attorney General that petitioner in this case failed to carry his burden of demonstrating prejudice, we reverse the judgment of the Court of Appeal.

### BACKGROUND

The relevant facts are largely undisputed. Petitioner Hugo Rangel Resendiz is a lawful permanent resident of the United States. He has lived and worked in this country for almost 25 years, most of his adult life. Petitioner has two children who are United States citizens.

In June of 1997, assisted by trial counsel Leonard Basinger, petitioner pled guilty in Orange County Superior Court to possession for sale of cocaine and marijuana (Health & Saf. Code, §§ 11351, 11359) and possession of a usable amount of methamphetamine (*id.*, § 11377, subd. (a)). On Basinger's advice, petitioner also initialed and signed a printed plea form stating, inter alia, "I understand that if I am not a citizen of the United States the conviction for the offense charged may have the consequence of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States." The signed form contains a paragraph, also initialed by petitioner, stating that the signer has "read, understood, and personally initialed each item above and discussed them with my attorney . . . ." At the plea hearing, petitioner was one of six defendants read their rights as a group, thusly: "If you are not a naturalized citizen of the United States, your conviction could result in your deportation or denial of naturalization at some later point in time."

Imposition of sentence was suspended, and petitioner was placed on felony probation for three years on conditions including that he serve 180 days in jail. After petitioner served his jail sentence, he was taken into custody by the United States Immigration and Naturalization Service (INS) and charged with being subject to removal from the United States under section 237(a)(2)(B)(i) (8 U.S.C. § 1227(a)(2)(B)(1) [conviction of controlled substance offense other than possession of marijuana for personal use]) and section 237(a)(2)(A)(iii) (8 U.S.C. § 1227(a)(2)(A)(iii) [conviction of "aggravated felony"]) of the Immigration and Nationality Act (INA) (8 U.S.C. § 1101 et seq.). Immigration authorities placed petitioner in administrative detention at the Mira Loma facility in Lancaster, California.

Petitioner retained new counsel and filed in the superior court a motion to vacate the judgment convicting him, asking the court to permit him to withdraw the guilty plea on which it was based. At the hearing on his motion, petitioner testified that when he was faced with the question of whether to plead guilty he held a "green card" (i.e., a certificate of permanent residency) and was, therefore, a lawful permanent resident of the United States. Petitioner discussed his permanent residency status with his trial counsel, Basinger. Petitioner told counsel that it was concern about keeping his green card that had motivated him to hire a lawyer. According to petitioner, counsel told him that, if he pled guilty, he would have "no problems with immigration" except that he would not be able to become a United States citizen.

Petitioner further testified that he did not remember the court saying anything to him on these topics at the time he entered his plea. But after viewing the plea form bearing his signature and initials, petitioner agreed he had read and spoken with his lawyer about the form. The form contains a general advisement about possible immigration consequences of a conviction, couched roughly in the language courts are mandated to administer on the record by Penal Code section 1016.5, subdivision (a) (hereafter section 1016.5 and section 1016.5(a)).[1] After reading this printed advisement, petitioner stated he understood its use of the word "may" to mean "like it could

---

[1] Section 1016.5(a) provides that "[p]rior to acceptance of a plea of guilty or nolo contendere to any offense punishable as a crime under state law, except offenses designated as infractions under state law, the court shall administer the following advisement on the record to the defendant: [¶] If you are not a citizen, you are hereby advised that conviction of the offense for which you have been charged may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States." Owing to changes made after section 1016.5 was enacted, federal immigration law now generally refers to "removal from the United States" or simply "removal" instead of "deportation." (See, e.g., 8 U.S.C. §§ 1228 ["Expedited removal of aliens convicted of committing aggravated felonies"], 1229a ["Removal proceedings"].) The parties and the courts below have used the terms interchangeably, as do we.

happen." Petitioner also affirmed on cross-examination that he had answered "yes" when the judge asked him at the plea proceeding if he had signed the plea form and talked with his lawyer about it.

Finally, petitioner testified that, at the time of the plea, he had told his trial attorney that he was innocent of the drug charges against him. According to petitioner, he nevertheless pled guilty after counsel told him that, if he did not, he would be sentenced to five years in jail and that there were "a lot of innocent people going to jail." If he had known he would in fact be deported as a consequence, he would not have pled guilty and, if permitted to withdraw his guilty plea, he was willing to face the possibility of being retried and sent to prison for the maximum possible period, five years and four months.

In ruling on petitioner's motion, the court stated, "I don't think" that "all people are being deported for possession for sale or sale of narcotics." The court opined that such concerns (i.e., concerns, apparently, about the relative certainty of deportation as a consequence of the plea) were, in any event, not dispositive, but, rather, that the important consideration was "whether or not Mr. Resendiz knew that if he entered the plea that it [i.e., deportation] could happen." The court also stated it did not credit petitioner's testimony "when he says the Court didn't advise him at the time he entered the plea of his rights or the [immigration] consequences," noting petitioner signed and initialed the written plea form after it had been interpreted in Spanish, petitioner's native language. The court denied petitioner's motion to vacate the judgment.

Petitioner thereupon filed a petition for writ of habeas corpus in the Court of Appeal.[2] The Court of Appeal issued an order to show cause returnable before the superior court. (Pen. Code, § 1508, subd. (b).)

In the return, the district attorney acknowledged petitioner told counsel he wanted to protect his green card status, but denied that petitioner received ineffective assistance of counsel. The district attorney also acknowledged

---

[2]In his briefing to this court, the Attorney General refers to petitioner's original motion as Resendiz's "motion to withdraw his pleas"; petitioner calls it a "motion to withdraw the plea." Both the Attorney General and petitioner elsewhere on occasion have referred to petitioner's motion as one in "coram nobis." The Court of Appeal referred to petitioner's "motion to withdraw his pleas." In fact, the superior court's minute order denominates the motion as one "to vacate judgment," and at the hearing on the motion the court stated, "This is before the Court on a motion to vacate judgment and to withdraw the guilty plea." Fortunately, despite this degree of confusion in terminology, the parties are agreed that petitioner made the correct procedural choice in selecting habeas corpus as the vehicle for challenging the denial of his motion. (See generally *People v. Gallardo* (2000) 77 Cal.App.4th 971, 980-983 [92 Cal.Rptr.2d 161].)

that petitioner's trial counsel does not remember discussing the printed plea form with petitioner. Indeed, the district attorney submitted the declaration of counsel, Basinger, stating he has "no independent specific recollection" of any such interaction. Basinger's declaration also states it is his "custom and habit" to review plea forms carefully with his clients and to explain to noncitizen clients "that a guilty plea is likely to effect [sic] the client's ability to become a citizen. I also tell these clients that I make the assumption that the federal government is always wanting to deport non-citizen felons. I explain to them they should assume the government has a policy to deport people in their position." Finally, Basinger's declaration states that he has been an attorney, specializing in criminal defense, for 18 years.

Petitioner in his traverse reiterated his request to withdraw his guilty plea, reasserting both his innocence of the drug charges and his ignorance when pleading guilty that deportation was a nearly certain consequence. Petitioner argued that the police reports demonstrated he had "a triable case" on the merits of the drug charges, and he asserted that, had he known the immigration consequences a guilty plea would have, he would have exercised his right to proceed to trial.

Petitioner also argued that for his trial counsel to have provided adequate advice about the likely immigration consequences of his guilty plea would not have been unduly burdensome. To his traverse, petitioner appended the INS document, a "Notice to Appear," that charges him with being subject to removal from the United States on two grounds: for having been convicted of an offense involving a controlled substance, and for having been convicted of an "aggravated felony."

Before ruling on the order to show cause, the superior court read into the record the following stipulation filed by the district attorney and counsel for petitioner. "In lieu of an evidentiary hearing the People and Petitioner stipulate as follows: If called as a witness, Defense Counsel Leonard Basinger would testify that even though he knew Petitioner, his client, was an immigrant, he did not independently research or investigate the immigration consequences that would result from Petitioner entering a guilty plea. Mr. Basinger also did not contact an immigration attorney to seek advice about the immigration laws of the United States. Immigration laws include the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 [Pub.L. No. 104-208 (Sept. 30, 1996) 110 Stat. 3009-546 (hereafter IIRAIRA)] and the Antiterrorism and Effective Death Penalty Act of 1996 [Pub.L. No. 104-132 (Apr. 24, 1996) 110 Stat. 1214 (hereafter AEDPA)]. It is further stipulated that the Declaration of Leonard Dale Basinger, included as Exhibit 1 to the Return shall be admitted."

The superior court denied petitioner's petition. In so doing, the court stated, "I'm not even ruling on whether or not there are any deficiencies in Mr. Basinger's representation." The court also stated that it did "not believe it is insufficient and that it falls below an objective standard of reasonableness for Defense Counsel in this County, but even more important than that," the court stated, "I don't believe anything he could have done would have resulted or that it is reasonably probable that anything additional he could have done would have resulted in a result that is more favorable to [petitioner] . . . ."

Petitioner then filed a second habeas corpus petition in the Court of Appeal that is the subject of our review here. The Court of Appeal unanimously granted the writ, vacating petitioner's conviction and directing the trial court to allow him to withdraw his guilty pleas. We granted review on the Attorney General's petition.

## DISCUSSION

■■■ Plea bargaining and pleading are critical stages in the criminal process at which a defendant is entitled, under both the Sixth Amendment to the federal Constitution and article I, section 15 of the California Constitution, to the effective assistance of legal counsel. (*In re Alvernaz* (1992) 2 Cal.4th 924, 933 [8 Cal.Rptr.2d 713, 830 P.2d 747]; see generally *Hill v. Lockhart* (1985) 474 U.S. 52, 57-59 [106 S.Ct. 366, 369-371, 88 L.Ed.2d 203] (*Hill*).) "It is well settled that where ineffective assistance of counsel results in the defendant's decision to plead guilty, the defendant has suffered a constitutional violation giving rise to a claim for relief from the guilty plea." (*In re Alvernaz*, at p. 934, citing *Hill*, at pp. 56-60 [106 S.Ct. at pp. 369-371]; *McMann v. Richardson* (1970) 397 U.S. 759, 771 [90 S.Ct. 1441, 1449, 25 L.Ed.2d 763] (*McMann*).)[3]

■■■ To establish ineffective assistance of counsel under either the federal or state guarantee, a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's deficient performance was prejudicial, i.e., that a reasonable probability exists that, but for counsel's failings, the result would have been more favorable to the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 [104 S.Ct. 2052, 2064-2065, 80 L.Ed.2d 674] (*Strickland*); *People v. Waidla* (2000) 22 Cal.4th 690, 718 [94 Cal.Rptr.2d 396, 996 P.2d 46].)

---

[3]That the Sixth Amendment does not cover civil proceedings (conc. & dis. opn. of Brown, J., *post*, at p. 259) is of no consequence. Defendant's Sixth Amendment claim is directed to criminal defense counsel's representation in criminal proceedings.

The Attorney General, relying primarily on out-of-state and federal court decisions, urges us to announce a categorical bar to immigration-based ineffective assistance claims. For the following reasons we decline to impose such a categorical bar. Rather, we hold that affirmative misadvice regarding immigration consequences can in certain circumstances constitute ineffective assistance of counsel. We do not address whether a mere failure to advise could also constitute ineffective assistance.

## A. *Is petitioner's claim categorically barred?*

Ordinarily, "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." (*Strickland, supra,* 466 U.S. at p. 690 [104 S.Ct. at p. 2066]; see also *Roe v. Flores-Ortega* (2000) 528 U.S. 470, 478 [120 S.Ct. 1029, 1035, 145 L.Ed.2d 985] [rejecting per se rule that counsel must file notice of appeal unless defendant instructs otherwise as "inconsistent with *Strickland*'s holding that 'the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances' "].) The Attorney General, however, proffers two bases, on either of which, the Attorney General implies, we may avoid the task of specifically evaluating the particulars of trial counsel's performance in this case.

### 1. *Section 1016.5*

 The Attorney General argues, as does Justice Brown in her concurring and dissenting opinion, that a trial court's having provided a section 1016.5 advisement "should shield pleas from collateral attack" (conc. & dis. opn. of Brown, J., *post*, at p. 261) based on immigration consequences. We disagree.

That defendants have a right to counsel when they undertake the plea evaluation and negotiation specifically provided for in section 1016.5, subdivisions (b) and (d) is not disputed. And that right to counsel " 'is the right to the *effective* assistance of counsel.' " (*Strickland, supra,* 466 U.S. at p. 686 [104 S.Ct. at p. 2063], italics added.) We recognize that "it is the attorney, not the client, who is particularly qualified to make an informed evaluation of a proffered plea bargain." (*In re Alvernaz, supra,* 2 Cal.4th at p. 933.) ▬██ Thus, whether or not the court faithfully delivers section 1016.5's mandated advisements, "[t]he defendant can be expected to rely on counsel's independent evaluation of the charges, applicable law, and evidence, and of the risks and probable outcome of trial." (*In re Alvernaz*, at p. 933; see *People v. Gallardo, supra,* 77 Cal.App.4th at p. 988, fn. 9 [as the

court gave § 1016.5 advice, "the only arrow in [defendant]'s quiver below was ineffective counsel and his only remedy was habeas corpus"].)[4]

Under the Sixth Amendment, defendants are entitled so to rely and to expect representation "within the range of competence demanded of attorneys in criminal cases." (*McMann, supra*, 397 U.S. at p. 771 [90 S.Ct. at p. 1449].) The existence of a state statute requiring courts to deliver a specified immigration advisement cannot deprive defendants of these federal constitutional rights. (*In re Sutter-Butte By-Pass Assessment* (1923) 190 Cal. 532, 536-537 [213 P. 974] [Legislature "cannot, under the guise of creating a new statutory remedy, deprive a litigant of an existing constitutionally guaranteed right"].) Efforts to mine section 1016.5's history for hints the Legislature meant that statute to foreclose some kinds of ineffectiveness claims (see, e.g., conc. & dis. opn. of Brown, J., *post*, at pp. 260-261) are misplaced. What constitutes ineffective assistance of counsel is a question of constitutional law, not of legislative intent. Thus, that a defendant may have received valid section 1016.5 advisements from the court does not entail that he has received effective assistance of counsel in evaluating or responding to such advisements.[5]

The Attorney General's suggestion that we construe section 1016.5 as a categorical bar to immigration-based ineffective assistance claims "would deny defendants [who prove incompetence and prejudice] a remedy for the specific constitutional deprivation suffered" (*In re Alvernaz, supra*, 2 Cal.4th at p. 936), viz., the Sixth Amendment right to effective counsel. Any construction that might engender such constitutional infirmity is to be avoided. (*People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 199-200 [96 Cal.Rptr.2d 463, 999 P.2d 686] (*Zamudio*); *San Francisco Taxpayers Assn. v. Board of Supervisors* (1992) 2 Cal.4th 571, 581 [7 Cal.Rptr.2d 245, 828 P.2d 147].)

---

[4]For this same reason, and contrary to the People's suggestion at oral argument, the Legislature cannot have intended, when enacting section 1016.5, to burden pleading defendants (on pain of waiving subsequent Sixth Amendment claims) with an obligation to raise before the judge at the plea proceeding any concerns they might have about advice they receive from counsel regarding the court's section 1016.5 advisement. Such an intention would be inconsistent with the Legislature's provisions, in the same statute, that courts allow time for additional plea consideration and negotiations if the advisement raises concerns (§ 1016.5, subds. (b) & (d)) and also with its provision that "at the time of the plea no defendant shall be required to disclose his or her legal status to the court" (*id.*, subd. (d)).

[5]Nor is *In re Ibarra* (1983) 34 Cal.3d 277 [193 Cal.Rptr. 538, 666 P.2d 980] to the contrary. That "a defendant who has signed a [guilty plea] waiver form upon competent advice of his attorney has little need to hear a ritual recitation of his rights by a trial judge" (*id.* at p. 286) obviously does not imply the contrary proposition, that a defendant to whom a court has read a pro forma advisement like the one mandated by section 1016.5 cannot profit from competent legal advice about that advisement or concerns it may raise, under the circumstances, for that particular defendant.

Nothing, moreover, suggests that the drafters of section 1016.5 intended either to narrow defendants' relationships with their attorneys or to shield incompetent legal advisers. If anything, the statutory scheme contemplates an enhanced, not a diminished, role for counsel. (See § 1016.5, subds. (b) ["court shall allow the defendant additional time to consider the appropriateness of the plea in light of the advisement"] and (d) [court "shall grant the defendant a reasonable amount of time to negotiate with the prosecuting agency in the event the defendant or the defendant's counsel was unaware of the possibility of deportation, exclusion from admission to the United States, or denial of naturalization as a result of conviction"].)

For the foregoing reasons, section 1016.5 does not bar petitioner's claim.[6]

### 2. *Collateral consequences doctrine*

The Attorney General also suggests we categorically bar petitioner's ineffective assistance claim as based on a "collateral" consequence of his criminal conviction. A defense lawyer's giving erroneous advice to a defendant about immigration consequences cannot violate the pleading defendant's right to the effective assistance of counsel, reasons the Attorney General, because knowledge of immigration consequences is not a prerequisite to a determination that the plea was entered voluntarily.

While potentially "dire" (*People v. Superior Court (Giron)* (1974) 11 Cal.3d 793, 798 [114 Cal.Rptr. 596, 523 P.2d 636]), immigration consequences nevertheless are, in many jurisdictions including California, "considered 'collateral' consequences of a criminal conviction." (*Zamudio, supra,* 23 Cal.4th at p. 198; but see *Peart v. State* (Fla. 2000) 756 So.2d 42, 47, fn. 5 [implying that, in light of state criminal procedural rule similar to § 1016.5, the court will no longer treat immigration consequences as collateral].) We have not articulated precise definitions of "direct" and "collateral" in this context, but some California courts have, as the Attorney General points out, called "collateral" any consequence of a plea that "does not 'inexorably follow' from a conviction of the offense involved in the plea." (*People v. Crosby* (1992) 3 Cal.App.4th 1352, 1355 [5 Cal.Rptr.2d 159]; accord, *People v. Moore* (1998) 69 Cal.App.4th 626, 630 [81 Cal.Rptr.2d 658].) Indeed, the deportation consequences of a conviction are not "inexorable," in that deportation "can be instituted only 'upon the order of the Attorney General' (8 U.S.C. § 1227(a)) of the United States, who retains

---

[6]Whether review of section 1016.5 claims should be "no broader in scope" than review of *Boykin-Tahl* claims (conc. & dis. opn. of Brown, J., *post,* at p. 265) is not a question we need address in this case, as defendant is not making a section 1016.5 claim. Rather, defendant's claim is bottomed on the Sixth Amendment.

discretion not to institute such proceedings." (*Zamudio*, at pp. 204-205.)[7] Nevertheless, for the following reasons, we conclude that the "collateral" nature of immigration consequences does not foreclose petitioner's ineffective assistance of counsel claim.

First, the United States Supreme Court has made clear that ineffective assistance analysis is highly case specific, noting that " '[a]ttorney errors come in an infinite variety . . . .' " (*Hill, supra,* 474 U.S. at pp. 57-58 [106 S.Ct. at p. 370], quoting *Strickland, supra,* 466 U.S. at p. 693 [104 S.Ct. at p. 2067].) Accordingly, in every case "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." (*Strickland,* at p. 688 [104 S.Ct. at p. 2065]; accord, *Roe v. Flores-Ortega, supra,* 528 U.S. at p. 478 [120 S.Ct. at p. 1035].)

Second, the collateral consequence doctrine and ineffective assistance claims have separate origins. Recognition of the right to competent representation in the guilty plea context directly "stemmed from the [Sixth Amendment's] general principle that all 'defendants facing felony charges are entitled to the effective assistance of competent counsel.' " (*Hill, supra,* 474 U.S. at p. 57 [106 S.Ct. at p. 369], quoting *McMann, supra,* 397 U.S. at p. 771 [90 S.Ct. at p. 1449]; see also *McMann,* at p. 770 [90 S.Ct. at pp. 1448-1449] [distinguishing between the admissibility of a coerced confession and the competence of counsel in advising the confessing defendant to plead guilty].) The collateral consequences doctrine, on the other hand, originated as a policy-based adjunct to the due process requirement that a court ensure the guilty pleas it accepts are voluntarily given.[8] While the right to the assistance of counsel undoubtedly is " 'included in the conception of due process of law' " (*Powell v. Alabama* (1932) 287 U.S. 45, 67-68 [53 S.Ct. 55, 63-64, 77 L.Ed. 158, 84 A.L.R. 527]), such that claims grounded wholly or partly in the latter may include reference to the former (see, e.g.,

---

[7]We have stated that the "direct" consequences of a guilty plea include the range of punishment (*Bunnell v. Superior Court* (1975) 13 Cal.3d 592, 605 [119 Cal.Rptr. 302, 531 P.2d 1086]), a restitution fine (*People v. Walker* (1991) 54 Cal.3d 1013, 1022 [1 Cal.Rptr.2d 902, 819 P.2d 861]), a mandatory parole term (*In re Moser* (1993) 6 Cal.4th 342, 351-352 [24 Cal.Rptr.2d 723, 862 P.2d 723]) and a sex offender registration requirement (*People v. McClellan* (1993) 6 Cal.4th 367, 376 [24 Cal.Rptr.2d 739, 862 P.2d 739]). In addition to immigration consequences, California courts have called "collateral" the possibility of future use of a conviction to enhance punishment (*People v. Bernal* (1994) 22 Cal.App.4th 1455, 1457 [27 Cal.Rptr.2d 839]) and that a conviction will serve to revoke an existing probationary grant (*People v. Martinez* (1975) 46 Cal.App.3d 736, 745 [120 Cal.Rptr. 362, 121 Cal.Rptr. 443]).

[8]See, e.g., *Michel v. United States* (2d Cir. 1974) 507 F.2d 461, 465-466; *State v. Malik* (1984) 37 Wash.App. 414 [680 P.2d 770, 772]; see generally Note, *Weakness of the Collateral Consequences Doctrine: Counsel's Duty to Inform Aliens of the Deportation Consequences of Guilty Pleas* (1993) 16 Fordham Int'l L.J. 1094, 1105-1110 (Fordham Note).

*McMann*, at pp. 767, 770-771 [90 S.Ct. at pp. 1446-1447, 1448-1449]), it does not follow that every jurisprudential limitation on courts' due process responsibilities applies (or should apply) without alteration to all types of ineffective assistance of counsel claims.

The Attorney General offers no logical or jurisprudential reason why we should truncate our examination of counsel's Sixth Amendment responsibilities to noncitizen clients by invoking a categorical concept adopted for policy and convenience in delineating the Fifth and Fourteenth Amendment due process responsibilities of trial courts. Nor does any binding authority require that reduction.

To the contrary, even before the high court in *Strickland* expressly grounded the effective assistance guarantee in the Sixth Amendment's "presumption that counsel will fulfill the role in the adversary process that the Amendment envisions" (*Strickland, supra*, 466 U.S. at p. 688 [104 S.Ct. at p. 2065]), courts resolving ineffective assistance claims recognized a "shift of scrutiny in recent cases from the rudiments of the trial to the quality of representation by counsel [that] reflects a shift from the general requirements of the due process clause of the Fourteenth Amendment . . . to the more specific [Sixth Amendment] right to counsel." (*Krummacher v. Gierloff* (1981) 290 Or. 867 [627 P.2d 458, 461].) We acknowledged the point in *People v. Pope* (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1], stating there that the former " 'farce or sham' " ineffectiveness standard "originated in decisions which held that the right to competent representation derived solely from the due process clause" and "has been thoroughly discredited." (*Id.* at p. 422.) "[C]ourts now recognize that the right to competent representation at trial is grounded in the constitutional right to the assistance of counsel. [Citation.] Accordingly, constitutionally adequate assistance can no longer be measured by the due process standard of [*People v.*] *Ibarra* [(1963) 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487]], but instead must be determined by a standard bottomed on the Sixth Amendment of the United States Constitution and article I, section 15 of the California Constitution." (*Ibid.*, fn. omitted.)

The United States Supreme Court has never embraced the collateral consequences doctrine the Attorney General urges us to adopt in this case. In fact, on review of the Eighth Circuit Court of Appeals' holding that parole eligibility "is a collateral rather than a direct consequence of a guilty plea, of which a defendant need not be informed" in order for the plea to be considered voluntary (*Hill, supra*, 474 U.S. at p. 55 [106 S.Ct. at p. 368]), the high court, instead of itself invoking that doctrine, applied "[t]he longstanding test for determining the validity of a guilty plea[, i.e.,] 'whether the

plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant' " (*id.* at p. 56 [106 S.Ct. at p. 369]). Nor has the high court ever suggested that ineffective assistance claims based on the giving of erroneous immigration advice ought categorically to be barred. Rather, recognizing the tremendous personal stakes involved in deportation and exclusion, the court has admonished, "[i]n this area of the law, involving as it may the equivalent of banishment or exile, we do well to eschew technicalities and fictions and to deal instead with realities." (*Costello v. Immigration Service* (1964) 376 U.S. 120, 131 [84 S.Ct. 580, 586-587, 11 L.Ed.2d 559].)

Some cases applying the collateral consequences doctrine to bar immigration-based ineffective assistance claims purport to draw legal support from the high court's observation in *Brady v. United States* (1970) 397 U.S. 742, 755 [90 S.Ct. 1463, 1472, 25 L.Ed.2d 747], that a defendant must be made fully aware of the " ' "direct consequences" ' " of a guilty plea before the plea may be considered voluntary under the Fifth Amendment. (*U.S. v. Mora-Gomez* (E.D.Va. 1995) 875 F.Supp. 1208, 1211, fn. 7; see, e.g., *U.S. v. Banda* (5th Cir. 1993) 1 F.3d 354, 356; *U.S. v. Del Rosario* (D.C. Cir. 1990) 902 F.2d 55, 59.) *Brady,* however, was *not* an ineffective assistance case. The high court there held that "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts" (*Brady v. United States,* at p. 748 [90 S.Ct. at p. 1469]), expressly deriving that rule from the constitutional guarantee of jury trial and the Fifth Amendment's ban on compelled self-incrimination. As *Brady* did not consider the ineffective assistance of counsel issues before us in this case, it is no authority for deciding them one way or the other. (*Trope v. Katz* (1995) 11 Cal.4th 274, 287 [45 Cal.Rptr.2d 241, 902 P.2d 259]; *People v. Gilbert* (1969) 1 Cal.3d 475, 482, fn. 7 [82 Cal.Rptr. 724, 462 P.2d 580].)

The Attorney General cites our decision in *People v. Barella* (1999) 20 Cal.4th 261, 267-272 [84 Cal.Rptr.2d 248, 975 P.2d 37] for the proposition that a "defendant does not have to know the collateral consequences which follow his plea in order for the plea to be constitutional," but *Barella* also is inapposite. There, we held unanimously that "a defendant is not entitled to withdraw or set aside a guilty plea on the ground that the trial court, in accepting the plea, failed to advise the defendant of a limit on good-time or work-time credits available to the defendant." (*Id.* at p. 272.) In so holding, we noted that "[t]he United States Supreme Court has 'never held that the United States Constitution requires the State to furnish a defendant with information about parole eligibility in order for the defendant's plea of guilty to be voluntary' " (*id.* at p. 267) and stated that conduct and work credits are not " 'traditional "direct consequences" of a plea' " because they result from

the defendant's conduct after he arrives at prison and do not " 'follow inexorably from the plea' " (*id.* at p. 270). Thus, *Barella* addressed the court's role in meeting *Boykin-Tahl*[9] record requirements so as to assure that a defendant's guilty plea is voluntary, not counsel's obligation to provide effective assistance at every "critical stage in the criminal process" as required by the Sixth Amendment and California Constitution, article I, section 15. (*In re Alvernaz, supra,* 2 Cal.4th at p. 933.) The high court, as discussed, has never equated these two sets of obligations, nor does the Attorney General offer any persuasive reason why we should reach out to do so in this case.

Defense counsel clearly has far greater duties toward the defendant than has the court taking a plea. Effective counsel, for example, has a general duty to conduct a reasonable investigation of the case enabling counsel to make informed decisions about how best to represent the client. (*Strickland, supra,* 466 U.S. at p. 691 [104 S.Ct. at pp. 2066-2067].)[10] The court has no such duty. "Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest." (*Strickland,* at p. 688 [104 S.Ct. at p. 2065].) Again, the court has no such duties. "From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions" (*ibid.*); the court's function and duties quintessentially *exclude* such assistance, advocacy and consultation.

For the foregoing reasons, to tie defense counsel's Sixth Amendment duties to the constitutional minima the due process clause requires of courts, by carving out, for erroneous advice concerning immigration consequences, an exception to the general requirement that counsel perform with "reasonableness under prevailing professional norms" (*Strickland, supra,* 466 U.S. at p. 688 [104 S.Ct. at p. 2065]), would be illogical and counterproductive.

A few cases applying the collateral consequences doctrine to bar immigration-based ineffective assistance claims have expressed a concern that, as a matter of policy, to permit such claims "is to take the first step on a long,

---

[9]*Boykin v. Alabama* (1969) 395 U.S. 238, 243 and footnote 5 [89 S.Ct. 1709, 1712, 23 L.Ed.2d 274] (for valid guilty plea, due process requires voluntary and intelligent waiver of confrontation right, right to trial by jury, and privilege against compulsory self-incrimination); *In re Tahl* (1969) 1 Cal.3d 122, 132 [81 Cal.Rptr. 577, 460 P.2d 449] (same).

[10]See also *Wofford v. Wainwright* (11th Cir. 1984) 748 F.2d 1505, 1508 (discussing counsel's constitutional obligation to "offer his informed opinion as to the best course to be followed in protecting the interests of his client"); *Michel v. United States, supra,* 507 F.2d at page 465 (noting where the client is an alien "counsel and not the court has the obligation of advising him of his particular [immigration] position as a consequence of his plea").

slippery slope" that could "spawn endless litigation over effective assistance of counsel claims." (*State v. Christie* (Del.Super.Ct. 1994) 655 A.2d 836, 840.) The concern has no basis in law or logic. That a particular ineffective assistance claim might, depending on the circumstances, be viable despite the collateral nature of immigration consequences simply does not entail the viability of every—or even *any*—subsequent ineffective assistance claim that happens also to refer to a consequence similarly deemed collateral, and nothing we say here should be taken as suggesting the contrary.

In *People v. Reed* (1998) 62 Cal.App.4th 593, 601-602 [72 Cal.Rptr.2d 615], for example, the court rejected the defendant's ineffective assistance claim based on counsel's failure to advise him of a statutory limit on "good time" prison credits. The Attorney General cites *Reed* for its partial reliance on the federal courts' collateral consequences doctrine. (See *id.* at p. 597.) But *Reed* is distinguishable. Unlike this case, *Reed* did not involve allegations of an affirmative misrepresentation in response to a specific inquiry from the defendant. Indeed, the Court of Appeal in *Reed* expressly held open the possibility such misrepresentation might constitute ineffective assistance. (*Id.* at p. 601.)

On several counts, "deportation is far more significant than [some] other [collateral] consequences, such as losing one's driver's license or losing the right to vote." (Fordham Note, *supra*, 16 Fordham Int'l L.J. at p. 1140, fn. omitted.) "Perhaps nowhere outside of the criminal law are the consequences for the individual so serious." (*Wallace v. Reno* (D.Mass. 1998) 24 F.Supp.2d 104, 112.) Accordingly, that we decline to bar as collateral ineffective assistance claims based on erroneous immigration consequences advice plainly cannot determine the result in another context. Ultimately, "[i]n any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." (*Strickland, supra*, 466 U.S. at p. 688 [104 S.Ct. at p. 2065].)

Finally, the Legislature's enactment of section 1016.5, mandating specified immigration warnings in all plea cases, is a circumstance that distinguishes this case from cases involving other types of collateral consequences. Under the statutory mandate, defendants who wish to plead guilty are entitled to receive from the court some advice regarding immigration consequences—a general warning of three immigration consequences that "may" occur. (See § 1016.5(a).) In evaluating the court's advice, "[t]he defendant can be expected to rely on counsel's independent evaluation of the charges, applicable law, and evidence, and of the risks and probable outcome of trial." (*In re Alvernaz, supra*, 2 Cal.4th at p. 933.)

"The [defendant's] interest underlying [an ineffective assistance] claim is his interest in having, before he judges the desirability of the plea bargain, a general knowledge of the possible legal consequences of facing trial." (*Wofford v. Wainwright, supra,* 748 F.2d at p. 1508.) That interest will flow, presumably, more from a particular consequence's practical import than its formal categorization as collateral or direct. Classifying immigration consequences as collateral does not diminish their status as "material legal principles that may significantly impact the particular circumstances" surrounding a given plea. (*People v. Pozo* (Colo. 1987) 746 P.2d 523, 529.) Accordingly, that adverse immigration consequences may for certain due process purposes be collateral to petitioner's conviction should not preclude application of the ordinary *Strickland* standards to his ineffective assistance claim based on alleged immigration misadvice.

For the foregoing reasons, we conclude that neither the existence of section 1016.5 nor the collateral nature of immigration consequences constitutes a per se bar to an ineffective assistance of counsel claim based on counsel's misadvice about the adverse immigration consequences of a guilty plea. Therefore, we may not in this case avoid "the circumstance-specific reasonableness inquiry required by *Strickland.*" (*Roe v. Flores-Ortega, supra,* 528 U.S. at p. 478 [120 S.Ct. at p. 1035]; see also *Hill, supra,* 474 U.S. at pp. 57-58 [106 S.Ct. at pp. 369-370]; *U.S. v. Mora-Gomez, supra,* 875 F.Supp. at p. 1213.) Accordingly, we shall proceed to apply *Strickland*'s familiar reasonableness standard to the circumstances of the instant case. (*Strickland, supra,* 466 U.S. at p. 688 [104 S.Ct. at pp. 2064-2065].)

B. *Was trial counsel's performance objectively reasonable?*

As the Court of Appeal correctly noted, the evidentiary landscape relevant to the competence question before us was created in several superior court proceedings, including those at which petitioner's guilty plea was entered and accepted, those on petitioner's motion to withdraw his plea, and those following the Court of Appeal's issuance of an order to show cause in response to petitioner's first habeas corpus petition, in which the parties stipulated as to how trial counsel would testify. Petitioner's second habeas corpus petition in the Court of Appeal, the subject of our review, incorporated all the evidence adduced in the prior proceedings.

Whether trial counsel performed competently, that is, "reasonabl[y] under prevailing professional norms" (*Strickland, supra,* 466 U.S. at p. 688 [104 S.Ct. at p. 2065]), presents a mixed question of fact and law. Such questions are "generally subject to independent review as predominantly questions of law—especially so when constitutional rights are implicated"—

and "include the ultimate issue, whether assistance was ineffective, and its components, whether counsel's performance was inadequate and whether such inadequacy prejudiced the defense." (*People v. Ledesma* (1987) 43 Cal.3d 171, 219 [233 Cal.Rptr. 404, 729 P.2d 839].)

Where, as here, the superior court has denied habeas corpus relief after an evidentiary hearing (viz., the hearing held on the order to show cause ordered in response to petitioner's first habeas corpus petition) and a new petition for habeas corpus is thereafter presented to an appellate court based upon the transcript of the evidentiary proceedings conducted in the superior court, "the appellate court is not bound by the factual determinations [made below] but, rather, independently evaluates the evidence and makes its own factual determinations." (*In re Wright* (1978) 78 Cal.App.3d 788, 801 [144 Cal.Rptr. 535].)[11] Accordingly, the Court of Appeal was entitled, as we are now, to undertake "an independent review of the record [citation] to determine whether petitioner has established by a preponderance of substantial, credible evidence [citation] that his counsel's performance was deficient and, if so, that [he] suffered prejudice." (*In re Alvernaz, supra,* 2 Cal.4th at pp. 944-945.)

While our review of the record is independent and "we may reach a different conclusion on an independent examination of the evidence . . . even where the evidence is conflicting" (*In re Hitchings* (1993) 6 Cal.4th 97, 109 [24 Cal.Rptr.2d 74, 860 P.2d 466]), any factual determinations made below "are entitled to great weight . . . when supported by the record, particularly with respect to questions of or depending upon the credibility of witnesses the [superior court] heard and observed." (*In re Wright, supra,* 78 Cal.App.3d at p. 801; see also *People v. Ledesma, supra,* 43 Cal.3d at p. 219.) On the other hand, if "our difference of opinion with the lower court . . . is not based on the credibility of live testimony, such deference is inappropriate." (*In re Arias* (1986) 42 Cal.3d 667, 695 [230 Cal.Rptr. 505, 725 P.2d 664]; see also *In re Hitchings,* at p. 109.)

Petitioner and amici curiae strenuously urge us to declare that trial counsel's performance in advising petitioner about his guilty plea was constitutionally deficient simply because counsel failed to investigate the likely immigration consequences. We are not persuaded that the Sixth Amendment

---

[11]Upon receiving petitioner's second habeas corpus petition, the Court of Appeal issued an order to show cause returnable before itself and received a formal return and traverse. The court was not required to conduct an additional evidentiary hearing (*People v. Duvall* (1995) 9 Cal.4th 464, 478 [37 Cal.Rptr.2d 259, 886 P.2d 1252] [where any factual disputes are already shown in the trial record, " 'the merits of a habeas corpus petition can be decided without an evidentiary hearing' "]; *In re Hochberg* (1970) 2 Cal.3d 870, 876 [87 Cal.Rptr. 681, 471 P.2d 1]) nor, in any event, did either party request that it do so.

imposes a blanket obligation on defense counsel, when advising pleading defendants, to investigate immigration consequences or research immigration law. In any event, petitioner in this case does not allege a mere failure to investigate, so the question is not squarely presented.[12] As previously noted, "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case . . . ." (*Strickland, supra,* 466 U.S. at p. 690 [104 S.Ct. at p. 2066].) Petitioner urges the following as establishing that his trial counsel provided him with substandard representation.

### 1. *Counsel knew petitioner was a noncitizen*

The parties stipulated below that trial counsel Basinger, if called, would testify that he knew his client was an immigrant. All concede that counsel knew his client was a noncitizen.

### 2. *Counsel knew petitioner was concerned about immigration consequences*

Petitioner in this case made plain to counsel that he deemed immigration consequences important in deciding whether to plead guilty to the charges against him. Indeed, the People conceded below that petitioner told his trial counsel he wanted to protect his permanent residency status.

We long have recognized that criminal convictions may have "dire consequences" under federal immigration law (*People v. Superior Court (Giron),* *supra,* 11 Cal.3d at p. 798) and that such consequences are "material matters" (*id.* at p. 797) for noncitizen defendants faced with pleading decisions. Thus, even before the Legislature expressly recognized the unfairness inherent in holding noncitizens to pleas they entered without knowing the consequent immigration risks (see § 1016.5, subd. (d), added by Stats. 1977, ch. 1088, § 1, p. 3495), we held that justice may require permitting one who pleads guilty "without knowledge of or reason to suspect [immigration] consequences" to withdraw the plea. (*People v. Superior Court (Giron),* at p. 798 [permitting withdrawal of guilty plea to marijuana possession charge]; see also § 1016.5, subd. (c) ["Nothing in this section . . . shall be deemed to inhibit a court, in the sound exercise of its discretion, from vacating a judgment and permitting a defendant to withdraw a plea"].)[13]

The United States Supreme Court, too, has recognized that "deportation is a drastic measure and at times the equivalent of banishment or exile." (*Fong*

---

[12]Accordingly, amici curiae's request that we judicially notice the existence of certain published immigration reference works is denied.

[13]Our recognition in *People v. Superior Court (Giron), supra,* 11 Cal.3d 793, that the decision whether to allow the defendant to withdraw his plea was within the trial court's

*Haw Tan v. Phelan* (1948) 333 U.S. 6, 10 [68 S.Ct. 374, 376, 92 L.Ed. 433].) "To banish [noncitizens] from home, family, and adopted country is punishment of the most drastic kind whether done at the time when they were convicted or later." (*Lehmann v. Carson* (1957) 353 U.S. 685, 691 [77 S.Ct. 1022, 1025, 1 L.Ed.2d 1122] (conc. opn. of Black, J.).) Petitioner has lived in this country most of his adult life and has two children who are United States citizens. That petitioner discussed his permanent residency status with his counsel, emphasizing his desire to keep his green card, is therefore not surprising.

### 3. *Counsel's affirmative representations*

As discussed, petitioner testified that counsel told him that, if he pled guilty, he would have "no problems with immigration" except that he would not be able to become a United States citizen. Even among the federal and other courts cited by the Attorney General, "the clear consensus is that an affirmative misstatement regarding deportation may constitute ineffective assistance." (*U.S. v. Mora-Gomez, supra*, 875 F.Supp. at p. 1212.)[14]

In the Court of Appeal, the Attorney General acknowledged that for trial counsel to have assured petitioner he would have no immigration problems if he pled guilty would have been "irresponsible." More importantly, such advice would have been mistaken. Controlled substance violations "are the most damning convictions in the Immigration and Nationality Act. There are very few situations where a plea to a narcotics violation would not have a

---

discretion was not based on a determination that the failure of the court and counsel to advise defendant of the deportation consequences of his plea was neither judicial error nor ineffective assistance of counsel. (Cf. conc. & dis. opn. of Brown, J., *post*, at p. 260.) Our decision expressly was "governed by Penal Code section 1018, which provides that a guilty plea may be withdrawn before judgment and for good cause shown." (*Giron, supra*, 11 Cal.3d at p. 796.) No Sixth Amendment claim was raised (see *id.* at p. 797), and consequently we had in *Giron* no occasion to consider ineffective assistance.

[14]See also *People v. Huynh* (1991) 229 Cal.App.3d 1067, 1083 [281 Cal.Rptr. 785]; *Ostrander v. Green* (4th Cir. 1995) 46 F.3d 347, 355, overruled on another point in *O'Dell v. Netherland* (4th Cir. 1996) 95 F.3d 1214; *U.S. v. Del Rosario, supra*, 902 F.2d at page 59 and footnote 2; *U.S. v. George* (7th Cir. 1989) 869 F.2d 333, 337; *United States v. Campbell* (11th Cir. 1985) 778 F.2d 764, 768-769; *Downs-Morgan v. United States* (11th Cir. 1985) 765 F.2d 1534, 1541; *United States v. Santelises* (2d Cir. 1975) 509 F.2d 703, 703-704; *United States v. Briscoe* (D.C. Cir. 1970) 432 F.2d 1351, 1353-1354; *U.S. v. Corona-Maldonado* (D.Kan. 1999) 46 F.Supp.2d 1171, 1173; *United States v. Nagaro-Garbin* (E.D.Mich. 1987) 653 F.Supp. 586, 590; *People v. Pozo, supra*, 746 P.2d at page 527, footnote 5; *People v. Ford* (1995) 86 N.Y.2d 397 [633 N.Y.S.2d 270, 657 N.E.2d 265, 268-269]; *People v. Correa* (1985) 108 Ill.2d 541 [92 Ill.Dec. 496, 485 N.E.2d 307, 310-311]. There are a very few cases suggesting an affirmative misrepresentation is constitutionally irremediable (see, e.g., *United States v. Sambro* (D.C. Cir. 1971) 454 F.2d 918, 921-922; *United States v. Parrino* (2d Cir. 1954) 212 F.2d 919, 921-922), but, as one court has remarked, we properly may "regard those cases as aberrations" (*Strader v. Garrison* (4th Cir. 1979) 611 F.2d 61, 64).

fatal and permanent immigration consequence" as an "alien convicted of a crime 'relating to' controlled substances is deportable and excludable." (Brady et al., Cal. Criminal Law and Immigration (1997) Drug Convictions, Admissions, Trafficking, Addiction and Abuse, § 3.1, p. 1.)

Owing to the enactment of IIRAIRA and AEDPA in 1996, petitioner became subject to expedited removal from the United States upon pleading guilty to the charges against him, both because they involved controlled substances and because drug trafficking is considered an "aggravated felony."[15] The only contingency on which institution of actual removal proceedings at that point hung was that they be instituted "upon the order of the [United States] Attorney General" (8 U.S.C. § 1227(a)), which indeed they were.

The Attorney General suggests that petitioner's testimony about what his counsel told him was "rebutted" by counsel's declaration asserting it was his custom and practice to tell clients the government "is always wanting" to deport noncitizen felons.[16] Trial counsel does not recall what he actually told petitioner. Petitioner argues that, even if believed, counsel's declaration does not *necessarily* contradict his evidence that, at some point, counsel also told him specifically that a guilty plea would in fact generate no immigration problems.

The Court of Appeal found counsel's characterization of his custom and habit "unpersuasive." The Attorney General contends the Court of Appeal was insufficiently deferential to the trial court's stated conclusion that counsel's performance met "an objective standard of reasonableness for Defense Counsel in this County." Although the Court of Appeal was not bound to accept the superior court's factual findings, those findings were, as previously noted, entitled to " 'great weight,' " particularly where they involved assessment of witness credibility. (*People v. Ledesma, supra,* 43 Cal.3d at p. 219.)

Having examined the record, we are not able to determine with certainty whether counsel conformed to his purported custom and habit or whether he

---

[15]Title 8 United States Code sections 1101(a)(43)(B) ("aggravated felony" includes "illicit trafficking in a controlled substance"), 1227(a)(2)(A)(iii) (deportability for "aggravated felony"), 1227(a)(2)(B)(i) (deportability for controlled substance offense), 1228 (expedited removal). An exception to removal, "cancellation of removal," is not available to lawful residents convicted of such offenses. (8 U.S.C. § 1229b(b)(1)(C).)

[16]The Attorney General also points out that petitioner indicated at the hearing on his motion to vacate the judgment that, at the plea proceeding, he had answered "yes" when the judge asked him if he had signed the plea form and talked with his lawyer about it. As it turns out, petitioner was mistaken; the plea colloquy, in fact, included no such exchange.

supplemented any customary warning with a more specific, but incorrect, advisement. Ultimately, however, we need not resolve those factual questions. Even assuming that counsel affirmatively misadvised petitioner—and that petitioner thus has satisfied the performance prong of his ineffective assistance claim (*Strickland*, *supra*, 466 U.S. at pp. 687-688 [104 S.Ct. at pp. 2064-2065])—petitioner to prevail must additionally demonstrate prejudice, and this, we conclude, he has failed to do.

C. *Was petitioner prejudiced by counsel's deficient performance?*

The test for prejudice that is relevant in light of the preceding is well established. ▉▉▉ In *Hill*, *supra*, 474 U.S. at pages 58-59 [106 S.Ct. at pages 370-371], the United States Supreme Court explained that a defendant who pled guilty demonstrates prejudice caused by counsel's incompetent performance in advising him to enter the plea by establishing that a reasonable probability exists that, but for counsel's incompetence, he would not have pled guilty and would have insisted, instead, on proceeding to trial. (Accord, *In re Alvernaz*, *supra*, 2 Cal.4th at pp. 933-934; see also *People v. Brown* (1986) 177 Cal.App.3d 537, 554 [223 Cal.Rptr. 66].)

▉▉▉ Petitioner specifically avers that, if counsel had informed him he would be deported as a consequence of his guilty pleas, he would not have pled guilty and would have elected to be tried. As he points out, we previously have recognized that a noncitizen defendant with family residing legally in the United States understandably may view immigration consequences as the only ones that could affect his calculations regarding the advisability of pleading guilty to criminal charges. (*Zamudio*, *supra*, 23 Cal.4th at pp. 206-207.)

The Attorney General rightly reminds us, however, that petitioner's assertion he would not have pled guilty if given competent advice "must be corroborated independently by objective evidence." (*In re Alvernaz*, *supra*, 2 Cal.4th at p. 938; see also *U.S. v. Horne* (D.C. Cir. 1993) 987 F.2d 833, 836.) ▉▉▉ "In determining whether a defendant, with effective assistance, would have accepted [or rejected a plea] offer, pertinent factors to be considered include: whether counsel actually and accurately communicated the offer to the defendant; the advice, if any, given by counsel; the disparity between the terms of the proposed plea bargain and the probable consequences of proceeding to trial, as viewed at the time of the offer; and whether the defendant indicated he or she was amenable to negotiating a plea bargain." (*In re Alvernaz*, at p. 938.)

▉▉▉ Petitioner has not contended that his counsel inaccurately communicated the People's plea offer. Nor has he adduced any substantial evidence

suggesting the prosecutor might ultimately have agreed to a plea that would have allowed petitioner to avoid adverse immigration consequences. While the prosecution also did not introduce evidence in this regard, the burden remains petitioner's to prove by a preponderance of the evidence his entitlement to relief. (*In re Johnson* (1998) 18 Cal.4th 447, 460 [75 Cal.Rptr.2d 878, 957 P.2d 299].) In the end, petitioner pled guilty as charged; no charges were dropped.

Had petitioner proceeded to trial on the drug charges against him, and had the prosecution chosen to seek maximum penalties, petitioner faced a maximum total punishment of five years and four months of incarceration. The plea bargain that petitioner reached with the district attorney burdened him with only 180 days of local incarceration and three years of probation. The choice, moreover, that petitioner would have faced at the time he was considering whether to plead, even had he been properly advised, would *not* have been between, on the one hand, pleading guilty and being deported and, on the other, going to trial and avoiding deportation. While it is true that by insisting on trial petitioner would for a period have retained a theoretical possibility of evading the conviction that rendered him deportable and excludable, it is equally true that a conviction following trial would have subjected him to the same immigration consequences.

In determining whether or not a defendant who has pled guilty would have insisted on proceeding to trial had he received competent advice, an appellate court also may consider the probable outcome of any trial, to the extent that may be discerned. (Cf. *Hill, supra,* 474 U.S. at p. 59 [106 S.Ct. at pp. 370-371] [probable trial outcome relevant in assessing prejudice from counsel's failure to discover exculpatory evidence or present affirmative defense]; accord, *Roe v. Flores-Ortega, supra,* 528 U.S. at p. 485 [120 S.Ct. at p. 1039].) Petitioner states that he has consistently maintained his innocence and asserts that the police report shows he has a "triable case," but nothing in his declaration or the other evidence he offered indicates how he might have been able to avoid conviction or what specific defenses might have been available to him at trial. Nor did petitioner explain at the hearing on the order to show cause how the evidence might have exonerated him.

Based upon our examination of the entire record, petitioner fails, ultimately, to persuade us that it is reasonably probable he would have forgone the distinctly favorable outcome he obtained by pleading, and instead insisted on proceeding to trial, had trial counsel not misadvised him about the immigration consequences of pleading guilty. (See *Hill, supra,* 474 U.S. at pp. 58-59 [106 S.Ct. at pp. 370-371]; *In re Alvernaz, supra,* 2 Cal.4th at p. 934.)

## DISPOSITION

For the foregoing reasons, the judgment of the Court of Appeal is reversed.

George, C. J., and Kennard, J., concurred.

**MOSK, J.,** Concurring and Dissenting.— ██ 
 I concur fully in the lead opinion's legal analysis, set out in parts A and B of the lead opinion and the three prefatory paragraphs preceding part A, as far as it goes. (Lead opn., *ante*, at pp. 239-253.) I would, however, go farther. I believe Penal Code section 1016.5 imposes an affirmative duty on counsel in any criminal case to inquire of the client: "Are you a United States citizen?" If the answer is negative, counsel must advise the client of the immigration and nationality consequences of a criminal conviction. Failure to do so accurately constitutes a breach of duty under state law given the legislative mandate of section 1016.5.

And I strongly disagree with part C, in which the lead opinion concludes petitioner did not suffer prejudice. (Lead opn., *ante*, at p. 253 et seq.) Unquestionably, he has proved by a preponderance of the evidence facts that establish a basis for relief (*In re Cudjo* (1999) 20 Cal.4th 673, 687 [85 Cal.Rptr.2d 436, 977 P.2d 66]), i.e., he has established a reasonable probability that, but for his lawyer's omission, he would have gone to trial (*Hill v. Lockhart* (1985) 474 U.S. 52, 58-59 [106 S.Ct. 366, 370-371, 88 L.Ed.2d 203]; *Burket v. Angelone* (4th Cir. 2000) 208 F.3d 172, 189).

Subjective and objective reasons plainly establish petitioner's entitlement to relief.

Turning first to the objective reasons: In recent years, the immigration consequences of criminal convictions have verged on the monstrously cruel in their harshness compared to many of the crimes on which they are imposed.

Petitioner has been ordered to appear in immigration court for deportation proceedings on grounds of having been convicted of an "aggravated felony." (8 U.S.C. §§ 1101(a)(43)(B), 1227(a)(2)(A)(iii).)

"Aggravated felony" is a federal term of art that covers a broad variety of crimes, many of them relatively minor. It includes such misdemeanors as trivial batteries (8 U.S.C. 1101(a)(43)(F)), possession for sale of a marijuana cigarette (8 U.S.C. § 1101(a)(43)(B)), and theft resulting in a one-year suspended sentence (8 U.S.C. § 1101(a)(43)(G), (48)(B)). All of these, even

if misdemeanors under a state law, are aggravated felonies in federal concept. ·

The statutes are retroactive (110 Stat. 3009, § 321(b), p. 3009-628, codified at 8 U.S.C. § 1101, foll. (a)(43)(U)), so that an individual, regardless of legal status in and ties to the United States or length of residence here is liable for removal. In recent years, the federal government has sought to deport:

—a 34-year-old born in Germany who came to the United States about age 1, and who pleaded guilty to misdemeanor battery following a minor struggle in 1990;[1]

—a lawful permanent resident from Guatemala with two United States citizen children who resisted her husband as he engaged in one of the periodic assaults he had inflicted on her for years;[2]

—a Canadian who was duped by her boyfriend into selling him some controlled prescription medications.[3]

---

[1]"In 1988 [Mary Anne Gehris] pulled another woman's hair in a quarrel over a man. She was charged with battery, a misdemeanor, for that and for grabbing the woman around the neck, which she says she did not do. No witnesses appeared in court. On the advice of a public defender, she pleaded guilty. As is the Georgia practice, the judge gave her a one-year sentence, suspended for a year's probation.

"She has not been in any trouble since. She is married to a U.S. citizen and has a 14-year-old child, also a citizen." (Lewis, *Abroad at Home: "This Has Got Me in Some Kind of Whirlwind,"* N.Y. Times (Jan. 8, 2000).)

Mary Anne Gehris avoided deportation when the Georgia Board of Pardons and Paroles pardoned her in March 2000. (Lewis, *Abroad at Home: Rays of Hope,* N.Y. Times (Feb. 10, 2001).)

[2]"Over several years she complained to the police that her husband was assaulting her. In June 1998, during one of their disputes, her husband sat on [her] and hit her. Defending herself, she bit him. He called the police, who arrested her.

"[She] was charged with domestic assault. In a 10-minute hearing, a Virginia judge urged her to plead guilty without a lawyer. When she did, he sentenced her to six months' probation and 30 days in jail, to be suspended if she finished the probation. She did. She is now separated from her husband.

"At 5 in the morning last Jan. 13 two agents of the Immigration and Naturalization Service came to [her] home and arrested her for deportation. Why? The charging document . . . cited a section of the 1996 Immigration Act calling for deportation of anyone convicted of 'a crime of domestic violence.' " (Lewis, *Abroad at Home: The Mills of Cruelty,* N.Y. Times (Dec. 14, 1999); see 8 U.S.C. § 1227(a)(2)(E)(i).)

[3]"Catherine Caza asked the immigration judge, Rex J. Ford, what would happen to her 7-year-old American daughter if she was deported.

" 'Ma'am,' Judge Ford said, 'some of these situations are absolutely heart-wrenching. I will tell you that the law changed and there are no waivers for these things now. I'm not unsympathetic to your situation, but . . . .' He ordered her deported.

Among the results of these laws: language classes conducted in the Bristol County, Massachusetts, jail for people about to be deported to Portugal for relatively minor crimes after decades of residence in the United States. (Chevigny, *This American Life*, episode No. 170, Immigration (WBEZ radio, Chicago, broadcast Oct. 13, 2000).) The more than 400 immigrants removed from Bristol County alone (*ibid.*) are among the "[t]housands of immigrants [who] have suffered harsh consequences from the 1996 act[4]: been torn from their families, deported after decades in America, sent to countries where they know no one and do not speak the language. Some had committed serious crimes; others . . . were marked for deportation for trivial offenses committed long ago." (Lewis, *Abroad at Home: Rays of Hope*, *supra*, N.Y. Times.)

Under the current state of the law, the immigration court is powerless to do anything except deport petitioner. (8 U.S.C. § 1229b(a)(3).)

Neither could the state court have intervened at any point, now that judicial recommendations against deportation have been abolished. (*People v. Leung* (1992) 5 Cal.App.4th 482, 509 [7 Cal.Rptr.2d 290]; see *People v. Superior Court* (*Zamudio*) (2000) 23 Cal.4th 183, 206 [96 Cal.Rptr.2d 463, 999 P.2d 686].)

Because petitioner's drug convictions render him inadmissible in the future, he will never be allowed to return to the United States, even to visit his family. (8 U.S.C. §§ 1182(a)(2)(A)(i)(II), 1182(a)(2)(C)(i).)

If Mexico refuses to accept petitioner, he will enter an American Gulag that few know to exist. The federal government will imprison him indefinitely, as it has imprisoned countless other legally deportable but practically

---

"Ms. Caza, born in Sault St. Marie, Ontario, was brought to the United States at the age of 3, in 1960. She has lived here ever since: 37 years. Her story has twists that make it unusually harsh even by the standards of deportation cases.

"In 1980 in Florida, where she lives, Ms. Caza was taking amphetamine pills prescribed by a doctor. Her boyfriend, as she thought he was, repeatedly asked her to sell him some of the pills. She finally sold him 21, and he turned out to be an undercover Florida policeman. In 1981 she pleaded guilty to a drug charge and was put on probation for five years.

"The drug offense made her deportable. On Feb. 3, 1982, the Immigration and Naturalization Service issued an order to show cause why she should not be deported.

"Ordinarily the I.N.S. presents such an order to an immigration judge within weeks of issuing it. In this case the service did nothing for 15 years. It filed the order against Catherine Caza in immigration court on Feb. 24, 1997.

"The delay is of excruciating significance for Ms. Caza. In 1982 she was eligible for what is called waiver of deportation, which could be granted when deportation would cause extreme hardship to someone who had lived in this country for seven years or more. Changes in immigration law in 1996 made her and others like her ineligible for waiver." (Lewis, *Abroad at Home: "That's The Way It Is,"* N.Y. Times (Dec. 19, 1997) p. A39.)

[4]The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRAIRA) (Pub.L. 104-208 (Sept. 30, 1996) 110 Stat. 3009-546 et seq.).

undeportable individuals. For example, some 1,750 legatees of the Mariel evacuation from Cuba have languished indefinitely in federal prisons (*Rosales-Garcia v. Holland* (6th Cir. 2001) 238 F.3d 704, 711) without constitutional remedy, and without being accused of any crime. (*Carrera-Valdez v. Perryman* (7th Cir. 2000) 211 F.3d 1046, 1048; but see *Ma v. Reno* (9th Cir. 2000) 208 F.3d 815, 821-822 [such detention barred by statute], cert. granted *sub nom. Reno v. Kim Ho Ma* (2000) 531 U.S. 924 [121 S.Ct. 297, 148 L.Ed.2d 239], and contra, *Rosales-Garcia*, at p. 715.) Some linger in prison under the legal fiction, approved in the depths of the McCarthy era, that because they were excludable from the shores of the United States, legally they *do not exist* here even though they *are* here, and they may be detained for the rest of their lives. (*Shaughnessy v. Mezei* (1953) 345 U.S. 206, 215-217 [73 S.Ct. 625, 630-632, 97 L.Ed. 956]; *id.* at p. 217 [73 S.Ct. at pp. 631-632] (dis. opn. of Black, J.).)[5] One estimate finds some 4,000 immigration detainees floating in the limbo of indefinite imprisonment. (Marrero, *Nowhere to Call Home*, Jacksonville, Fla., Times-Union (Feb. 20, 2001).)

Those are the objective reasons that support petitioner's claim for relief.

Subjective reasons confirm the merits of petitioner's claim. The undisputed corroborating evidence that he (1) is willing to risk years in state prison to gain a glimmer of a chance of escaping conviction and thereby avoiding deportation, and (2) that he has United States citizen children, establishes a reasonable probability that if he had known he would be deported, permanently banished, and involuntarily separated from his children unless they chose to move to Mexico and abandon the privileges attendant to living in the United States (all consequences of his guilty plea), he would have elected to proceed to trial. If "a defendant's conclusion that success is remotely possible, if not likely, is sufficient to induce many to go trial" (*State v. Van Cleave* (Ind. 1996) 674 N.E.2d 1293, 1297), how much more that must be for someone in petitioner's situation, facing lifetime banishment from his home and family.[6] Without a doubt, the foregoing evidence meets the *Hill* burden—i.e., it establishes a reasonable probability that, but for his lawyer's omission, he would have gone to trial.

---

[5]The Sixth Circuit Court of Appeals, in *Rosales-Garcia*, found it necessary to remind the federal government that there are limits to the atavism of the immigration laws. "[W]hile the government argues for absolute judicial deference to its plenary power over immigration policies, it is clear to this court that Congress may not authorize immigration officials to treat excludable aliens with complete impunity. For example, the INS [Immigration and Naturalization Service] may not, consistent with the Constitution, execute an excludable alien should it be unable to effect his prompt deportation. It is also evident that Congress cannot authorize the infliction of physical torture upon an excludable alien while he is detained in federal prison." (*Rosales-Garcia v. Holland, supra*, 238 F.3d at p. 721.)

[6]As one attorney explained in a radio interview: "I think that it's time that people thought about deportation for what it is. . . . [I]t's almost like a little death penalty case every time you do one. . . . [W]hen you see the families, particularly the mothers, this is about the

Few with petitioner's family and cultural ties to the United States would turn down a chance, even a slight chance, of escaping the talons of the federal law. A rational person could conclude that the great likelihood of spending some five years in a California prison, balanced against the slight chance of avoiding permanent banishment to the developing world, is a worthwhile gamble. (See *Peart v. State* (Fla. 2000) 756 So.2d 42, 50, fn. 9 (conc. opn. of Anstead, J.).) Obviously petitioner has so concluded. To deny him his choice is tragic, defying any accurate reading of *Hill v. Lockhart*, *supra*, 474 U.S. 52.

I therefore respectfully dissent with respect to part C of the lead opinion.

**BROWN, J.,** Concurring and Dissenting.—I concur in the disposition because I agree that petitioner has failed to show prejudice. I write separately because the lead opinion offers protection nobody needs, for reasons that are nowhere explained, through a method that will impose prohibitive costs on the administration of criminal justice. If we are going to cast a cloud on the validity of hundreds—perhaps thousands—of guilty pleas, we should explain why concerns about immigration entitle a defendant to multiple accurate advisements when the express waiver of constitutional rights is satisfied with one.

As courts throughout the country have held, incorrect information from counsel does not prejudice a defendant who receives correct information from the court. Reviewing courts need only verify the defendant received the correct information before pleading guilty. Resendiz received the Penal Code section 1016.5[1] advisement from the court, and thus cannot show prejudice.

I.

*Counsel Had No Duty to Advise*

We have never before held the right to receive immigration advice from defense counsel is guaranteed by the Sixth Amendment to the United States Constitution or article I, section 15 of the California Constitution. The Sixth Amendment is limited by its text: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." The amendment does not cover civil proceedings: "The protections provided by the Sixth Amendment are explicitly confined to 'criminal prosecutions.' "

---

worst thing that can happen to a family." (Chevigny, *This American Life, supra*, episode No. 170, Immigration.)

[1]Hereafter, all statutory references are to the Penal Code unless otherwise indicated.

(*Austin v. United States* (1993) 509 U.S. 602, 608 [113 S.Ct. 2801, 2804, 125 L.Ed.2d 488].) Counsel's performance is thus measured against that of reasonably competent criminal defense counsel, not counsel specializing in civil fields like immigration. (*Wiley v. County of San Diego* (1998) 19 Cal.4th 532, 542 [79 Cal.Rptr.2d 672, 966 P.2d 983] [defendants entitled to "counsel acting reasonably ' "within the range of competence demanded of attorneys in criminal cases" ' "].)

The vast majority of other courts, state and federal, have also concluded there is no Sixth Amendment right to receive advice regarding the immigration consequences of a guilty plea, and the absence of advice cannot constitute ineffective assistance of counsel. (*U.S. v. Gonzalez* (1st Cir. 2000) 202 F.3d 20, 25; *U.S. v. George* (7th Cir. 1989) 869 F.2d 333, 337-338, and cases cited therein; *State v. Dalman* (N.D. 1994) 520 N.W.2d 860, 863-864, and cases cited therein; *Com. v. Frometa* (1989) 520 Pa. 552 [555 A.2d 92, 94], and cases cited therein.)

In *People v. Superior Court (Giron)* (1974) 11 Cal.3d 793 [114 Cal.Rptr. 596, 523 P.2d 636] (*Giron*), the defendant pleaded guilty; neither defense counsel, the prosecutor, nor the court advised him he could be deported as a result. (*Id.* at p. 797.) We held the trial court could exercise its discretion in deciding whether to allow the defendant to withdraw his plea under those circumstances. We did not deem the absence of such an advisement to be either judicial error or ineffective assistance of counsel. We refused to hold that defendants who plead guilty have a right to information regarding a collateral consequence like deportation. (*Ibid.*)

The Legislature responded to *Giron* by enacting section 1016.5. In so doing, the Legislature expressed concern "about the 'many instances involving [noncitizen defendants]' in which 'a plea of guilty or nolo contendere is entered without the defendant knowing that a conviction of such offense is grounds for deportation.' " (*People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 193 [96 Cal.Rptr.2d 463, 999 P.2d 686], quoting § 1016.5, subd. (d).) " '[T]o promote fairness to such accused individuals,' " the Legislature mandated a specific warning about possible deportation consequences. (*Ibid.*)

The statute's history discloses the Legislature considered the advisement not merely a hint to discuss the matter with counsel, but a complete and conclusive provision of the information the defendant needed. Senator Alex Garcia, the author of Senate Bill No. 276, explained, "[T]his bill is primarily designed to assure that lawful aliens . . . are made fully aware of the consequences of [their] plea." (Sen. Garcia, letter to Governor Brown re:

Sen. Bill No. 276 (1977-1978 Reg. Sess.) Sept. 14, 1977.) Committee reports similarly explained the bill's purpose was to "assure that a non-citizen criminal defendant is fully apprised of the consequences [of her plea]." (Assem. Com. on Crim. Justice, analysis of Sen. Bill No. 276 (1977-1978 Reg. Sess.) as amended Aug. 25, 1977, p. 1.) There is no evidence the Legislature contemplated this full apprisal could be modified or impeached by counsel's off-the-record remarks.

The statute would be mere surplusage if it provided defendants with advice that was already constitutionally mandated. The right to notice of the possible collateral consequence of deportation is statutory in origin; the Sixth Amendment to the United States Constitution does not entitle a defendant to immigration advice. The lead opinion does not suggest otherwise.

## II.

### *Any Misadvice from Counsel Was Harmless in Light of the Court's Correct Advisement*

The lead opinion notes a clear consensus nationwide that finds an "affirmative misstatement regarding deportation may constitute ineffective assistance" of counsel. (*U.S. v. Mora-Gomez* (E.D.Va. 1995) 875 F.Supp. 1208, 1212; see lead opn., *ante*, at p. 251 & fn. 14.) The cases cited are all distinguishable; none involved a judicial advisement similar to the one required by section 1016.5. The defendants in those cases were thus vulnerable to counsel's misadvice, as Resendiz was not.

The section 1016.5 advisement should shield pleas from collateral attack. The Legislature designed the advisement to combat ignorance on the part of pleading defendants; a defendant must have the correct information, but it does not matter from whom he receives it. (*People v. Quesada* (1991) 230 Cal.App.3d 525, 536 [281 Cal.Rptr. 426] (*Quesada*).) The Court of Appeal upheld Quesada's plea because he received the correct information from counsel, even though the court failed to read the requisite advisement. (*Id.* at p. 539.) Consistent with the statute's purpose, Quesada pleaded with awareness of the potential consequences.

As the *Quesada* court observed, the critical question is whether the defendant received the correct information. He is not entitled to multiple warnings on the subject. As the on-the-record pronouncements of the court carry more weight than the private remarks of counsel (*United States v. Parrino* (2d Cir. 1954) 212 F.2d 919, 921), judicial advisement ensures the

plea is intelligent, notwithstanding contrary guidance from counsel. Although the lead opinion notes the consensus holding that misadvice may constitute ineffective assistance absent judicial advisement, there is an even clearer consensus holding that misadvice, even if it amounts to deficient representation under *Strickland v. Washington* (1984) 466 U.S. 668, 687 [104 S.Ct. 2052, 2064, 80 L.Ed.2d 674], is not prejudicial where the court provides the correct advice.

## A.

Most apposite to our review is the decisional authority of Florida, the other state whose large noncitizen population has prompted careful consideration of this issue. Florida courts have concluded that the very purpose of that state's section 1016.5 analogue is to guarantee defendants receive correct advice regarding deportation, rather than have them depend on their criminal counsel, who may be unfamiliar with immigration law. So long as Florida defendants receive that judicial advisement, counsel's misadvice cannot render the plea unknowing and invalid.

In *State v. Ginebra* (Fla. 1987) 511 So.2d 960, the Florida Supreme Court cited *Giron, supra*, 11 Cal.3d 793, in concluding a defendant had no right to advice from either the court or counsel concerning immigration consequences, and thus a defendant's ignorance regarding the possibility of deportation did not invalidate the plea. (*Ginebra*, at pp. 961-962.) As California forestalled the potential unfairness of *Giron* by enacting section 1016.5, Florida answered *Ginebra* by adding subsection (c)(viii) to rule 3.172 of the Florida Rules of Criminal Procedure (hereafter subsection (c)(viii)), which requires courts to inform defendants their guilty pleas could lead to deportation. (See *In re Amendments to Florida Rules* (Fla. 1988) 536 So.2d 992.)

The presence or absence of this judicial advisement now determines whether counsel's misadvice regarding deportation will support vacating a plea. Misadvice may support an ineffective assistance claim when the court fails to advise the defendant. (*Dugart v. State* (Fla.Dist.Ct.App. 1991) 578 So.2d 789.) But an adequate court advisement is clearly intended to have a prophylactic effect. "Starting with the cases espousing the principle that there is no right to be informed of the collateral consequences of a guilty plea, which were followed by the 1988 amendment to the Rules of Criminal Procedure instructing judges to advise a defendant that deportation could result if the defendant is not a United States citizen, it is reasonable to conclude that *the supreme court intended to avoid the vacating of guilty pleas on the sole ground that the non-citizen defendant may have been misinformed about deportation as a collateral consequence of pleading guilty. Otherwise,*

*there was little reason for adopting subsection (c)(viii)."* (*Bermudez v. State* (Fla.Dist.Ct.App. 1992) 603 So.2d 657, 658, italics added.) Because the court properly advised the defendant, *Bermudez* denied the defendant's claim of ineffective assistance based on counsel's alleged misstatement.

## B.

Federal courts likewise hold judicial advisements safeguard pleas from collateral attack, because the court's advice cures any possible harm arising from counsel's error. There is no federal parallel to section 1016.5 or subsection (c)(viii), but analogous cases have consistently affirmed that defendants do not suffer prejudice from counsel's misadvice, even if it amounts to deficiency under *Strickland v. Washington, supra,* 466 U.S. 668, where the court provides the correct information.

In *U.S. v. Thornton* (9th Cir. 1994) 23 F.3d 1532, the defendant pleaded guilty, received a sentence of life imprisonment, and subsequently challenged his plea as being the product of counsel's erroneous advice. The Ninth Circuit Court of Appeals rejected the claim: "[E]ven if Thornton's attorney and the parties didn't realize the guidelines allowed a life sentence," "the district judge advised him that a life sentence was possible, [citation], thus rendering any advice given by Thornton's counsel, even if erroneous, non-prejudicial." (*Id.* at pp. 1533-1534.) Substitute "deportation" for "a life sentence," and the instant analysis is the same, except that deportation, while significant, is a collateral consequence, not within the control of the sentencing court.

Other circuits are in accord. In *Barker v. U.S.* (7th Cir. 1993) 7 F.3d 629, the defendant pleaded guilty after allegedly receiving misadvice from counsel about the possible sentence. The Seventh Circuit Court of Appeals found the trial court's advice "cured" any possible harm. "In this case, even if advice from [the] trial attorney had led to [Barker's] misunderstanding of the consequences of his guilty plea, any such confusion was cured by the trial court [which took] careful and appropriate measures to dispel any confusion on Mr. Barker's part before the plea was accepted." (*Id.* at p. 633; see also *Worthen v. Meachum* (10th Cir. 1988) 842 F.2d 1179, 1184, disapproved on other grounds in *Coleman v. Thompson* (1991) 501 U.S. 722, 749-751 [111 S.Ct. 2546, 2564-2565, 115 L.Ed.2d 640] ["even if Worthen's attorney's alleged mistaken advice about parole rendered his performance inferior to that reasonably expected of attorneys . . . , Worthen was not prejudiced by advice that the court specifically told him was incorrect"].)

The rule is the same even where (1) the defendant alleges counsel informed the defendant the court's advisement will not apply due to the

defendant's particular circumstances (rather than being wrong generally); and (2) counsel confirms he provided this misadvice. In *Ramos v. Rogers* (6th Cir. 1999) 170 F.3d 560, Ramos's collateral attack on his plea included affidavits from both himself and counsel describing an off-the-record agreement that would have granted Ramos probation after he had served one year in prison. Counsel informed Ramos the deal "would not be discussed on the record during his plea" and thus "[Ramos should] just answer [the court's] questions at the plea as if no deals had been made," and to " 'just go along with what the judge asked me.' " (*Id.* at pp. 562-563.) The Sixth Circuit Court of Appeals rejected Ramos's claim, noting "the state trial court specifically asked Ramos, 'Do you understand that [rape] is not a probationable offense, that you are not going to receive probation under any circumstances?' " (*Id.* at p. 565.) Recalling this express advisement, the Sixth Circuit found no "prejudice when the court specifically informed [Ramos] that his counsel's advice was incorrect." (*Ibid.*) The Ninth Circuit similarly rejected the claim of a defendant whose attorney allegedly advised him that if he pleaded guilty he would be eligible for parole in seven years, and that the court would announce there was no possibility of parole only for the benefit of the public. (*Dennis v. People of State of California* (9th Cir. 1969) 414 F.2d 424, 425.) The *Dennis* court refused to vacate the plea, emphasizing the colloquy in which both counsel and the court described the sentence as being " '*without* possibility of parole.' " (*Id.* at p. 426, fn. 2.)

Furthermore, the People need not prevail in a credibility contest to protect the plea from collateral attack; the rule is the same even where the trial and appellate court agree that (1) counsel provided misadvice; and (2) it amounted to "ineffective assistance of counsel." (*Warner v. U.S.* (6th Cir. 1992) 975 F.2d 1207, 1211 (*Warner*).)[2] Trial counsel incorrectly advised Warner, who faced federal and state charges, that the federal district court could impose sentence concurrent to Warner's state sentence. (*Warner*, at p. 1211.) The Sixth Circuit Court of Appeals found no prejudice, however, because the district court advised Warner, " 'I am not in any way concerned with the State sentence . . . . I will impose a Federal sentence . . . [and] that Federal sentence will go into effect, but in no way will that be shortened or modified by the State sentence.' " (*Ibid.*) The Sixth Circuit also rejected Warner's claim he lied to the court, in denying any off-the-record promises had been made, on the instruction of counsel: "Even if Warner did deny knowledge of a plea agreement in reliance on [counsel's] mistaken advice, this does not amount to prejudice when the court specifically informed him that . . . advice was incorrect." (*Id.* at p. 1212.)

Most tellingly, the federal district court and the circuit court did vacate Warner's plea to the state charges because the state court never corrected

---

[2]The *Warner* court apparently used the phrase "ineffective assistance of counsel" to refer to *Strickland*'s first prong.

counsel's misadvice. "These . . . findings are not inconsistent. The federal court advised Warner that there would be no concurrent sentences, the state court did not." (*Warner, supra,* 975 F.2d at p. 1214.) The presence of correct judicial advice thus distinguishes cases where counsel's misadvice justifies vacating a plea from those where it does not.

### III.

*Appellate Review of the Instant Claim Requires Only a Quick Review of the Transcript to Ensure the Court Properly Advised Defendant*

Appellate review of claims like Resendiz's may therefore be limited. For a plea to be valid, the record must reveal the defendant was informed he could be deported as a consequence of his plea. On-the-record advisement is necessary—and sufficient.

On-the-record advisement serves a dual purpose; it protects both the defendant and his plea. (*Boykin v. Alabama* (1969) 395 U.S. 238, 244 [89 S.Ct. 1709, 1712-1713, 23 L.Ed.2d 274] (*Boykin*); *In re Tahl* (1969) 1 Cal.3d 122, 132 [81 Cal.Rptr. 577, 460 P.2d 449].) *Boykin* prescribed on-the-record advisement of a defendant's constitutional rights to guarantee the plea was voluntary and knowing. On the one hand, on-the-record advisement ensured defendants did not plead guilty out of ignorance. On the other, "[w]hen the judge discharges that function, he leaves a record adequate for any review that may be later sought . . . and *forestalls the spin-off of collateral proceedings that seek to probe murky memories.*" (*Boykin,* at p. 244 [89 S.Ct. at pp. 1712-1713], fns. omitted, italics added.) *Boykin* advised courts to examine defendants to ensure they understand the nature of the charges, the constitutional rights being waived, and the permissible range of sentences, " '[i]f these convictions are to be insulated from attack.' " (*Id.* at p. 244, fn. 7 [89 S.Ct. at p. 1713], quoting *Commonwealth v. Rundle* (1968) 428 Pa. 102 [237 A.2d 196, 197-198].)

Determining the knowing nature of a plea is a "simple[] task." (*People v. Allen* (1999) 21 Cal.4th 424, 442 [87 Cal.Rptr.2d 682, 981 P.2d 525].) Because on-the-record advisement is both necessary and sufficient, our evaluation of *Boykin-Tahl* challenges is minimal. "[T]he record of the hearing . . . should clearly demonstrate the defendant was told of his rights and that he affirmatively waived them. . . . [A] quick review of the transcript of the sentencing hearing may be all that is necessary." (*Allen,* at p. 442.) Only in those "unusual cases" where no advisement precedes the plea will further investigation be necessary. (*Ibid.*)

Review of section 1016.5 claims should be no broader in scope. The statutory preference for defendants to understand the possible collateral

consequences of their pleas does not warrant more zealous protection than the constitutional imperative that defendants understand their constitutional rights and the direct consequences of their pleas. (*People v. Ramirez* (1999) 71 Cal.App.4th 519, 522 [83 Cal.Rptr.2d 882].) The record reflects Resendiz received correct advice regarding deportation; no further review is warranted. (Cf. *People v. Allen, supra,* 21 Cal.4th at p. 442.)

### Conclusion

Defendant, who was advised by the court he could be deported and confirmed he understood this possibility, now seeks to withdraw his plea based on his not knowing he could be deported. To credit his claim rewards disregard for the court and creates an incentive for mendacity.

Defendant's claim must fail because the court provided him with all the information to which he was entitled, and all the information the Legislature has deemed necessary for an intelligent plea. The judicial advisement places a defendant on notice. He may, depending on the importance he attaches to the potential consequence, seek additional time, clarification and expert advice. But if his understanding is contrary to the court's warning, "it [is] imperative that [defendant] not stand mute during the plea colloquy." (*Resta v. State* (Fla.Dist.Ct.App. 1997) 698 So.2d 378, 379.)

The lead opinion encourages "prob[ing] murky memories," contrary to *Boykin* (*supra,* 395 U.S. at p. 244 [89 S.Ct. at p. 1713]). Memories are likely to be especially murky in cases like this one, where counsel may well be torn between protecting himself from an ineffectiveness finding and protecting a client from conviction and deportation. Even if not every collateral attack is successful, searching beyond the transcript and taking testimony from all involved parties will significantly strain judicial resources.

By enacting section 1016.5, the Legislature responded appropriately and effectively to the potential for unfairness to noncitizen defendants. The law was the first of its kind and has served as a national model.[3] Today's opinion signals to criminal defendants that the court's advice is wasted breath; defendants may safely ignore the pronouncement of the court, accept the benefit of the bargain, and plead ignorance years after the fact. Nothing is

---

[3]Every state that has prescribed a specific text has adopted section 1016.5's warning practically verbatim (Conn. Gen. Stat. § 54-1j(a); D.C. Code § 16-713(a); Hawaii Rev. Stat. § 802E-2; Mass. Gen. Laws ch. 278, § 29D; Ohio Rev. Code § 2943.031(A); Wash. Rev. Code § 10.40.200(2)), and two states have even adopted the legislative findings expressed in section 1016.5, subdivision (d) (Hawaii Rev. Stat. § 802E-1; Wash. Rev. Code § 10.40.200(1)).

created by the lead opinion except confusion. I therefore concur in the disposition only.

Baxter, J., and Chin, J., concurred.

Petitioner's petition for a rehearing was denied June 13, 2001. Mosk, J., was of the opinion that the petition should be granted.