Filed 2/27/15  P. v. Martinez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G050031 |
| v. | (Super. Ct. No. 13NF0974) |
| JUAN MOLINA MARTINEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Sheila F. Hanson, Judge.  Affirmed.

Marta I. Stanton, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

\*          \*          \*

A jury found defendant Juan Molina Martinez guilty of assault of a minor with intent to commit a sexual assault as charged in count one, and guilty of lewd act upon a child as charged in count two. After hearing and denying defendant's motion for new trial, the court sentenced defendant to seven years in state prison.

We appointed counsel to represent defendant on appeal. Counsel filed a brief which set forth the facts of the case. Counsel did not argue against the client, but advised the court no issues were found to argue on defendant's behalf. We have examined the record and found no arguable issues. (*People v. Wende* (1979) 25 Cal.3d 436.) Defendant was given 30 days to file written argument in defendant's own behalf. That period has passed, and we have received no communication from defendant. We affirm.

I

FACTS

*The Incident*

Gloria was 15 years old when she testified in October 2013. In May 2012 Gloria went to the home of her friend, Jazmin M. to celebrate Jazmin's 14th birthday. Gloria, Jazmin and Julia, another friend from school, were in Jazmin's bedroom watching movies. At some point, Julia had to go home, so Jazmin took her downstairs while Gloria stayed in the bedroom to finish watching a movie.

Jazmin was gone for about 20 minutes, and when she returned, she looked scared, panicked, frightened, was shaking, crying, breathing hard and couldn't talk, according to Gloria. Gloria asked Jazmin what happened, and Gloria testified Jazmin told her, "the security guard from outside was talking to her, but then things started getting really weird so she went upstairs and he chased after her." "She told me that he started touching her and started kissing her, and then when he heard footsteps coming down the stairs he let her go." At that point, the court advised the jury Jazmin's statements to Gloria were not to be considered for their truth, but to show whether there

2

was a complaint made, the nature of the complaint and the circumstances under which the complaint was made.

Gloria continued describing the conversation with Jazmin. Gloria told Jazmin to tell her parents, but Jazmin said she was scared of what might happen to her if she told her parents. Gloria called Jazmin's mother to the room, and then Gloria stepped outside the room.

Jazmin's mother testified she went to Jazmin's room and found her nervous and crying. She related what Jazmin told her, "the security guy downstairs had grabbed her and had kissed her." Once again, the court admonished the jury of the limited purpose for which they could consider Jazmin's statements to her mother.

During her testimony, Jazmin identified defendant as the security guard. Jazmin described what defendant did after Julia's parents arrived to take Julia home: "He told me if it was my birthday and then I said yes. And he — he took out his hand to shake my hand, and I, like, wasn't sure, but then I shook his hand and he pulled me closer and he, like, tried to kiss my neck, but he, like, hugged me tight." (Error in original.)

As Jazmin walked back to her apartment, defendant followed her. When she reached a landing after a flight of stairs, defendant "grabbed [her] against the wall and started touching [her], kissing [her]." She described what happened: "He grabbed me from my arms and pinned me to the wall." At the same time, defendant told her she was "fine and pretty and that he wanted to take [her] to his house and never let [her] go." Jazmin said he "started putting his hands in my pants" touching her butt and then "he started putting his hands up my shirt." She said the touching was skin-to-skin, and he went under her underwear and squeezed her "butt." He touched her breasts both over and under her bra. All the while, defendant was kissing Jazmin on her neck, face and mouth. She was crying, tried to push him away and twice told him to stop. Defendant stopped when they heard footsteps and Jazmin ran to her apartment.

3

Upon learning of the situation, Jazmin's father told her to call the police. Jazmin's 911 report was played to the jury. During that telephone call, Jazmin told the dispatcher: "I was dropping my friend off 'cause she came to my house for a party and then her parents came and picked her up and before, um, I was going to go and then her parents picked her up I was going to go to my house and he followed me to my house, he got me in the stairs and he started raping me."

*Jury Selection*

Outside the presence of the jury, the court conferred with counsel. The court stated: "During jury selection today the court received a handwritten note that was provided by Juror No. 158 to my deputy, Deputy Rodriguez. I did share that note with both counsel. The note reads as follows: [¶] 'I overheard Juror [No.] 154 and the potential juror seated in box seat No. 1 about the citizenship of the defendant. Juror [No.] 154, . . . "we should just send him back," . . . occurred in hallway during lunch.' [¶] I shared that information and that note with both counsel. After doing so, both counsel agreed to stipulate to excuse Juror No. 154 without any questioning of her. [¶] Later on when there was a break in the proceedings before any additional peremptories were exercised, the court did take the opportunity to inquire of Juror [No.] 148, which was the person made reference to about being seated in box No. 1 in this note. That question occurred on the record outside of the jurors presence. Both counsel indicated they didn't wish the court to take any additional action." (Errors in original.)

*DNA Evidence*

A forensic scientist from the Orange County crime laboratory testified defendant could not be excluded as a minor contributor of the DNA from a sample taken from Jazmin's mouth. Jazmin could not be excluded as a minor contributor of DNA in a sample taken from defendant's mouth either. With regard to what the word "minor"

4

means in this context, the following question was posed by the prosecutor and answered by the forensic scientist:

"Q: What is the frequency that you would expect the minor contributor profile from the mouth sample to occur in the population?

"A: It would be one in 300 individuals."

With regard to a sample taken from Jazmin's buttocks, the forensic scientist opined it was possible defendant was a contributor but he couldn't say either way. The scientist's opinion about the samples taken from Jazmin's breast, hands, neck and cheeks were the same; he couldn't say either way.

*Prosecutor's Final Argument*

During the prosecutor's questioning of a police officer with the Fullerton Police Department, the prosecutor elicited the fact defendant was wearing a uniform as well as carrying a gun, handcuffs and pepper spray when police first contacted him after the incident. Later, during final argument, the prosecutor told the jury: "He's armed. He's armed. While he's talking to both Eduardo Martinez and the officers he's armed. And while he's talking to the officers, surprisingly enough nobody takes his gun, takes his handcuffs or takes his pepper spray from him until after he's identified by Jazmin during the in-field I.D. and he is arrested."

*Motion for New Trial*

The crux of defendant's primary issue in his motion for new trial was that trial counsel was ineffective because he misled defendant into believing a misdemeanor "possible deal" was available, and by failing "to secure a deal" for him. He also contended the court should have excluded DNA evidence because it was more prejudicial than probative. He further argued prosecutorial misconduct compelled reversal of his conviction. The court permitted defendant to present witnesses to support his arguments.

5

Defendant was asked whether trial counsel had any discussions with him about "any possible negotiations in this case," and he responded "No." Defendant testified he asked trial counsel about the next step and trial counsel responded: "We're going to go to trial, and after a few days you're going to be free." Counsel asked defendant: "Did you understand that [trial counsel] could get you an offer in this case?" Defendant responded: "I didn't understand that, but I did want an offer."

Trial counsel was also called to testify. During questioning by the prosecutor who tried the case, the following questions and answers were asked and answered:

"Q: At some point, did you ask me for an offer in this case?

"A: Yes, I believe it was just prior to trial. You were sitting on the second row in CJ5 (sic) and before we approached the court, I asked if there was any offer. [¶] My recollection is it's going to involve state prison, and it's going to be pleading to one count midterm or something like that. It was going to be a state prison term, and, of course, the strike.

"Q: At any time, at any time, during the pendency of this case, did I ever indicate to you that a misdemeanor was going to be possible in this case? Misdemeanor resolution.

"A: No, if I had heard misdemeanor out of your mouth I would have run and got my client to sign a plea sheet, and we would have been done with it."

As to the ineffective assistance of counsel argument, the trial court stated: "The court does not believe that the performance of [trial counsel] fell below any objective standard of reasonableness. [¶] . . . the court finds that [trial counsel] assertions as to those areas of conflict carry more credibility."

With regard to defendant's argument that it was error to admit DNA evidence in his case, the court ruled: "In terms of the admission of the DNA experts being a violation or prejudicial or error of law, I disagree with the defense moving

6

papers. [¶] The notion that there should have been no expert and there should have been reliance on the reports themselves, it is hard to fathom on an evidentiary basis in which the court would have been legally proper to merely accept the report itself without testimony. [¶] There was nothing confusing about the DNA evidence, and the court does not believe that there was any error of law in the admission of the DNA evidence."

Defendant's motion for new trial also contended: "The prosecutor committed prejudicial misconduct when she stated in her closing argument that Martinez was in possession of a handgun at the time he committed the alleged offense, even though the evidence she presented during her case in chief did not establish that Martinez used the handgun in the commission of the alleged offense." (Capitalization omitted.)

When the court denied the motion for new trial, the court stated: "The court, likewise, does not believe that there was any prejudicial misconduct in the People's closing argument. [¶] The defense in this case was that the defendant, in essence, was assaulted by an irate father. He was surprised and uncertain as to what was happening and he was scared. [¶] It's hard to fathom how he could have been scared when he was a[n] armed security guard. And the fact that the People brought that out in their rebuttal argument in light of the defense closing argument, the court finds that there was no prejudice in that."

*Sentencing*

The probation officer reported no serious or violent crimes in defendant's criminal history. In 2001, defendant was convicted of a misdemeanor, violation of Vehicle Code section 12500, subdivision (a), driving a motor vehicle without a valid driver's license. Defendant was fined for three traffic violations. The probation officer noted the victim was particularly vulnerable and that, while it did not appear it was used during the commission of the present crimes, defendant was wearing a gun on his duty belt during the incident.

7

Defendant was presumptively ineligible for probation. (Pen. Code §§ 1203.065, subd. (b)(1) and 220.) The court sentenced defendant to the middle term of seven years on count one, and stayed the two-year sentence on court two pursuant to Penal Code section 654.

II

DISCUSSION

Pursuant to *Anders v. California* (1967) 386 U.S. 738, appellate counsel suggested one issue to assist this court in its independent review of the record: "Whether [defendant] was denied the right to effective assistance of counsel." Counsel notes the Sixth Amendment right to effective assistance of counsel extends to the plea bargaining process.

Indeed, plea bargaining is a critical stage "in the criminal process at which a defendant is entitled under both the Sixth Amendment to the federal Constitution and article I, section 15 of the California Constitution, to the effective assistance of counsel. [Citations.]" (*In re Resendiz* (2001) 25 Cal.4th 230, 239.)

Here, defendant argued ineffective assistance of counsel in his motion for new trial, criticizing trial counsel for not securing "a deal" for him. But when defendant, himself, was questioned, he said he had no understanding counsel could have gotten him an offer in his case. Trial counsel testified he asked the prosecutor for an offer, and none was forthcoming. Considering the gravity of the crimes involved and the possibility defendant would suffer conviction of a serious or violent crime within the meaning of the "Three Strikes" law, the lack of an offer is not surprising. (Pen. Code, §§ 664, 1192.7, subdivision (c)(29).) We agree with the trial court that trial counsel's performance did not fall below any objective standard of reasonableness. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.)

## III

## DISPOSITION

The judgment is affirmed.


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


THOMPSON, J.

9