Filed 3/28/24  P. v. Nguyen CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B322978 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. BA215889 |
| v. | |
| TUNG THANH NGUYEN, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, James R. Dabney, Judge.  Reversed and remanded with directions.

Christopher Lionel Haberman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

A trial court may vacate the criminal conviction of a noncitizen if a preponderance of the evidence establishes that the conviction is "legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence." (Pen. Code,[1] § 1473.7, subd. (a)(1).) To establish prejudicial error, defendants must demonstrate a "reasonable probability that [they] would have rejected the plea if [they] had correctly understood its actual or potential immigration consequences." (*People v. Vivar* (2021) 11 Cal.5th 510, 529 (*Vivar*); *People v. Espinoza* (2023) 14 Cal.5th 311, 316 (*Espinoza*).)

In 2021, appellant Tung Thanh Nguyen, a permanent resident of the United States and citizen of Vietnam, filed a motion to vacate his conviction for assault with a semiautomatic firearm, alleging his defense counsel gave him no advice as to the adverse immigration consequences of his no contest plea. He also asserted he never would have entered into the plea agreement had he known the charge compelled his deportation. The trial court denied the motion to vacate.

After the trial court's ruling, our Supreme Court clarified and expounded on the factors to be considered in adjudicating motions under section 1473.7, disapproving the former standard used by trial courts around the state. Because the trial court did not consider some of the now relevant factors, we reverse with directions to set the matter for a new evidentiary hearing.

---

[1]     Undesignated statutory references are to the Penal Code.

2

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  The Conviction

On June 15, 2001, appellant was charged with willful, deliberate and premeditated attempted murder and assault with a semiautomatic firearm plus several enhancements.  He was an 18-year-old high school student.  On October 15, 2001, pursuant to a plea agreement, appellant pled no contest to assault with a semiautomatic firearm in violation of section 245, subdivision (b).  On October 29, 2001, appellant was sentenced to the mid-term of six years in prison.  The attempted murder charge and enhancements were dismissed pursuant to the plea agreement.  Deportation proceedings were later initiated against appellant based on this conviction.  He was ordered removed by an immigration judge on December 10, 2004.[2]

During the plea colloquy, the prosecutor advised appellant, "First of all, if you are not a citizen of this county—I don't know if you are or not, but if you are not, you will be deported, denied naturalization, denied readmission, denied amnesty, denied the ability to work and other rights pursuant to the laws of the

---

[2]  We grant appellant's request for judicial notice of Item 2, which shows appellant was ordered removed by an immigration judge on December 10, 2004.  (Evid. Code, § 451, subd. (a).)  We deny the same request for items 1 and 3 as these documents were not presented to the trial court and may be presented to the trial court on remand.  Item 1 is a Repatriation Agreement between the United States of America and the Socialist Republic of Vietnam signed January 22, 2008.  Item 3 is an article entitled "Deporting Vietnamese Refugees: Politics and Policy from Bush to Biden (Parts 1 and 2)."

United States. [¶] Do you understand that, sir?" Appellant said, "Yes."

II.     **2021 Motion to Vacate**

On July 29, 2021, appellant moved to vacate his conviction pursuant to section 1473.7, subdivision (a)(1) on the ground that he had not been advised of the immigration consequences of his plea. Appellant supported the motion with his own declaration and a declaration by his immigration attorney. He also submitted documents showing that his three sisters are American citizens.

III.    **Facts Presented in the Motion**

Appellant was born in Vietnam in 1982 and came with his family to the United States as a lawful permanent resident in 1990 when he was seven years old. He has resided continuously in the U.S. since his arrival.

Appellant's parents died in 2008; the rest of his immediate family members (a half-brother and three sisters) reside in the United States and are American citizens. He has no ties to Vietnam as all his immediate relatives live in this country. He currently resides with his significant other and her two children whom he is helping to raise. He is the main breadwinner for his family and has been self-employed as a handyman since 2018. He has paid his income taxes since 2005 as required by law.

At the time of his arrest appellant was an 18-year-old high school student with no legal knowledge. He had one juvenile court adjudication and no adult convictions. He had no legal knowledge. The offense to which he pled no contest arose out of a shooting involving two cars, each carrying several gang members. The shooting was prompted by a month-long "feud" between the

4

victim and appellant. Earlier on the day of the shooting, the victim's car approached the car in which appellant was riding and someone yelled a threat and pointed a revolver out of the victim's car at appellant and the other occupants of his car. Thereafter, an unidentified man chased appellant around the high school campus, brandishing a "Club" anti-theft device. The man later vandalized appellant's car with the "Club." Ultimately the two groups of individuals stalked each other in their cars and appellant was accused of shooting at the victim's moving car, wounding the victim.

## IV. Advice of Counsel

Appellant was represented in his criminal case by attorney Michael Bruggeman, who was retained by appellant's parents. In support of the 2021 motion, appellant submitted his sworn declaration that his counsel never advised him of the immigration consequences of the plea. Appellant stated that the entire time he was in pretrial detention at the Los Angeles County Jail his counsel saw him once and did not inquire about his immigration status or suggest he seek the advice of an immigration lawyer. Bruggeman did not tell him that a plea would have immigration consequences. Specifically, he did not advise appellant that he would lose his lawful permanent resident status because of the conviction, deportation would be mandatory, and that once deported he would not be allowed to return to the U.S. under any circumstances.

On the day set for trial, Bruggeman visited appellant in the courthouse lockup and explained that a prosecution witness was refusing to cooperate and the People were therefore offering him a plea agreement that was a reasonably good offer. The offer was a plea of no contest to count 2, assault with a deadly weapon, for

a nine-year sentence, in exchange for dismissal of the attempted murder charge. Appellant rejected the offer. Bruggeman later returned and told appellant the offer had been amended to include a shorter prison term of six years.

Appellant believed mistakenly that his status as a legal permanent resident and his longtime residence in the United Staes would allow him to apply for a waiver or pardon to avoid deportation. As it turned out immigration proceedings were initiated against him based on the conviction and he learned, after meeting with an immigration attorney, that he had pled no contest to an aggravated felony, which meant mandatory deportation and a lifetime bar against returning to the United States.

Appellant declared that had he been aware of the actual immigration consequences, he would have fought the case or pled to a different immigration-neutral charge, even if it carried a higher sentence, as he had no ties or family in Vietnam.

Fabian Serrato, an immigration and criminal defense attorney, also filed a declaration setting out the consequences of a plea to an aggravated felony—mandatory deportation, lifetime exclusion from the United States, disqualification from naturalization, and cancellation of removal and any other form of relief from deportation. Had he been involved in the plea negotiations, he would have attempted a settlement that involved an immigration-neutral conviction and he would have advised appellant of the mandatory deportation that flowed from the proffered plea agreement.

V.   **The Trial Court's Hearing and Decision**

The People's written opposition to the motion argued that there was no objective, contemporaneous evidence that appellant

6

entered into the plea under a mistake or confusion, as required by *Vivar*, *supra*, 11 Cal.5th at pp. 518–520.) (This is the standard rejected in *Espinoza*.) On June 24, 2022, the trial court held an evidentiary hearing on the motion to vacate the conviction. Appellant testified as did his former counsel, Bruggeman.

Appellant testified that he saw his attorney once at the county jail and after that he saw him in the courthouse when he presented the proposed plea agreement. Bruggeman told him that the original deal of nine years incarceration would allow him to "see daylight again rather than get 25 [years] to life." Bruggeman did not ask about his immigration status or tell him to see an immigration attorney. He did not tell appellant he would have immigration consequences because of the plea agreement. He only told appellant he would not be deported because Vietnam was not accepting its citizens back.

At the time of this conversation, appellant was a senior in high school. Appellant testified Bruggeman told him there was a 70 to 80 percent chance he would lose the case if it went to trial, so "that's why I took the deal." When asked if he would have made a different decision had he known about the mandatory deportation, appellant testified, "Yeah. My whole family [is] here. I came here when I was 7. I live with my parents, my sisters. I have no ties in Vietnam. I would rather just fight the case. [¶] . . . [¶] I would have never taken the deal."

On cross-examination appellant stated that he knew he was facing a possible sentence of life in prison on the attempted murder charge. Appellant stated he felt he did not need an interpreter at the change of plea hearing as he felt confident going forward in English. He stated he did not want to take the 6-year deal either and his counsel responded that if he did not

7

take it, he was looking at 25 years to life in prison. Appellant reiterated that if there was a chance of being deported he would have fought the case because "My family all – there's no reason for me to go back over there to a country I don't know." He agreed to "whatever they say" in court because his attorney had already told him the consequence which was " 'Oh yeah, they won't deport you. They don't take many people. You don't have to worry about it.' " Appellant emphasized it was not a discussion about getting deported; it was just a statement. Despite the admonition in court during the plea about immigration consequences, appellant "assumed whatever my lawyer told me before that, I listened to what he said. [¶] . . . [¶] I was scared and I just listened to my lawyer. You know, so whatever he advised me, you know, me taking the deal, I'm going to get out again. [¶] I don't have to worry about anything. Things like that. I wasn't thinking straight. You know."

Attorney Bruggeman also testified. He represented appellant 21 years before and did not recognize him in court. They communicated with each other without problems in English. He could not recall any specific concerns appellant may have had or any discussions he had with appellant. He had to fall back on his "custom and practice." He stated his practice is to discuss immigration consequences with every client. He was aware of the list of crimes called aggravated felonies in federal court. His practice was to discuss immigration consequences with clients. He stated he discussed immigration consequences with appellant, although he could not remember having the discussion. He said it "would have been my custom and practice with that kind of offer, that kind of charge— it's clearly an aggravated felony—that there would be immigration

8

consequences, and that more than likely, either he would be contacted in state prison, or otherwise, there would be proceedings to remove him or deport him from the United States of America. [¶] That was going to happen." He clarified, "If I can, my custom and practice at that time—and I cannot recall, those of us around the 11th of September of 2001, there was a pretty big event, and anyone who was in any risk of immigration proceedings was suffering those risks. [¶] So I guess what I'm saying is if it's an aggravated felony that there would be immigration consequences. That is my unschooled opinion as a criminal defense lawyer, knowing what I know about the immigrations system at that time." He understood that after 9/11, immigration was picking up and deporting people very quickly.

Bruggeman clarified again that he didn't "recall any specific conversations with Mr. Nguyen. " I do know what my— and I do know my custom and practice has been the last 24 years—actually, the last 27 years—and I do know my custom and practice was and still is with regard—with regard to immigration consequences of serious crimes of which all these charges were—and that is that there would be immigration consequences and that that would be something the court would inquire with him as well. [¶] That also comes up in every conversation."

Bruggeman did not recall if appellant articulated any concerns about immigration consequences. If he had done so, his practice was to suggest very highly that he discuss it with an immigration lawyer. He stated that he never said there would be no immigration consequences.

On cross-examination, Bruggeman stated he did not have appellant's file anymore. Before testifying he reviewed the prosecutor's file. He clarified that he had no memory of whether he advised appellant of immigration consequences. He had no recollection of asking appellant if he was an immigrant, but that would have been his custom and practice. He again testified that it would have been his custom and practice to tell appellant that there would be immigration consequences if he took the plea offer because the charges were aggravated felonies. It would have been his custom and practice to tell appellant he could be deported. "My custom and practice would be to tell him that these charges are aggravated felonies, and they will trigger immigration consequences." It was not his custom and practice to tell him that he had a possibility of staying in the United States despite this conviction. His custom and practice would be to discuss the immigration consequences and if he was interested in further information, he could consult with an immigration lawyer. Bruggeman had no specific training or experience in immigration consequences other than handing a few cases. Counsel did not recall telling appellant that the unavailability of a prosecution witness prompted the better deal. He did not recollect telling appellant that Vietnam was not accepting its citizens and he believed he would not have known that detail at the time of the plea because he was not an immigration lawyer.

Appellant was recalled to testify. He reiterated that his attorney had told him Vietnam was not accepting its citizens. He also reiterated that counsel told him he was getting the deal because a witness was not available, but if the witness was ever pulled over by police, the witness would then become available to testify against him. He also said counsel asked him if he would

10

like to act as an informant in order to get a better deal. Appellant declined.

The trial court made its findings: "I think at the time, his concern was sitting in county jail and the case that he was looking at. I guess the—this isn't like a case where somebody is looking at the option of getting out today or serving a couple years in county jail for a theft case. [¶] This is a case where somebody's looking at getting out with a determinate sentence of [six] years at 85 percent or potentially going down on a life case. [¶] Even if the premeditation allegation hadn't been proven up, and there were facts in this particular case that made that a very, very, very triable issue, but it could have gone either way based on the confrontation that preceded this and then the driving pattern that ensued. So it's—it could have gone either way. But the bottom line is the 12022.53 [firearm] allegation, all they have to prove is attempted murder, and they're done. Then the 12022.53 would kick in. [¶] He was looking at spending the rest of his life in prison, which his attorney apparently informed him of and was honest, you know, about it. It wasn't that he had—he wasn't told he had no chance of victory. [¶] He was told the chance of losing was 70 to 80 percent, according to your own client. So he had a 10 to 20 percent chance of prevailing. I don't believe that Mr. Bruggeman would have told him that he wasn't going to get deported to Vietnam. [¶] I mean, I don't believe that. And I think that's the lynchpin on this. Because otherwise if he had believed that—because he was a refugee and Vietnam was not accepting people—he would have—you know—anyway. [¶] I found him credible when he said he didn't know what the ramifications of the fact that it was Vietnam would be in this particular case. [¶] So I think on balance while I recognize the

11

result is really typical for Mr. Nguyen, now, 21 years later, but I don't think at the time by a preponderance of the evidence that he would not have pled had he been advised in a different manner as to the immigration consequences of the plea. [¶] And the court's going to take note that, I mean, if that was really a concern at the top of his mind, the prosecutor's telling him that he will be deported, and this admonition went well beyond what's required by [section] 1016.5, that would have been the time to speak up. [¶] That's part of the record. Custom and practice. I'm not convinced that you have carried your burden, so the motion is denied. [¶] I don't know what's happening with immigration with Mr. Nguyen. I, personally, if I had the power, I would say that somebody who has redeemed themselves should be able to stay, and they should leave it alone. [¶] At 18, people do some incredibly stupid things, and they're not necessarily the same people when they're 29."

## DISCUSSION

### I.    **Applicable Law**

Mandatory deportation from the United States is an immigration consequence where a defendant is convicted of a crime deemed an aggravated felony under federal immigration law. (*Moncrieffe v. Holder* (2013) 569 U.S. 184, 187–188; 8 U.S.C. § 1228(c) [aggravated felony is conclusively presumed deportable].) Assault with a deadly weapon, combined with a sentence of more than one year, is an aggravated felony. (8 U.S.C. § 1101(a)(43)(F).)

Section 1473.7 authorizes a person to file a motion to vacate a conviction or sentence for any of the following reasons: "The conviction or sentence is legally invalid due to prejudicial

error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence."  (§ 1473.7, subd. (a)(1).)

Effective January 1, 2019, legislative amendments to section 1473.7 afforded a defendant relief under the statute without a showing of ineffective assistance of counsel per the *Strickland*[3] standard.  (*People v. Camacho* (2019) 32 Cal.App.5th 998, 1005; Stats. 2020, ch. 317, §5.)  To establish prejudice, defendants must show by a preponderance of the evidence that they did not meaningfully understand or knowingly accept the actual or potential adverse immigration consequences of the plea. (*Camacho*, at pp. 1010–1011; see *People v. Mejia* (2019) 36 Cal.App.5th 859, 862 (*Mejia*); see *People v. Martinez* (2013) 57 Cal.4th 555, 565 [defendants may show prejudice by convincing the court that a reasonable probability exists they "would have chosen to lose the benefits of the plea bargain despite the possibility or probability deportation would nonetheless follow"]; *People v. Rodriguez* (2021) 60 Cal.App.5th 995, 1003.)

The advisement that a defendant *may* face certain adverse immigration consequences is insufficient to inform a defendant that the conviction would subject him to mandatory deportation and permanent exclusion from the United States.  (*People v. Lopez* (2022) 83 Cal.App.5th 698, 712 (*Lopez*); *Vivar, supra,* 11 Cal.5th at p. 521 [to warn merely that a plea might have immigration consequences in circumstances where the consequences were certain is constitutionally deficient]; *People v.*

---

[3]     *Strickland v. Washington* (1984) 466 U.S. 668.

*Superior Court (Zamudio*) (2000) 23 Cal.4th 183, 204 [same].)
Apart from a trial court's advisement, defense counsel has an
independent obligation to explain to clients the adverse
immigration consequences of a criminal plea. (*People v.
Manzanilla* (2022) 80 Cal.App.5th 891, 905 (*Manzanilla*).)

The importance of counsel's responsibility to give a client a
complete advisement of all material adverse immigration
consequences cannot be overstated – and it is not excused by
official admonitions given during plea colloquy. As our Supreme
Court has stated: "That defendants have a right to counsel when
they undertake the plea evaluation and negotiation specifically
provided for in section 1016.5, subdivisions (b) and (d) is not
disputed. . . . '[I]t is the attorney, not the client, who is
particularly qualified to make an informed evaluation of a
proffered plea bargain.' [Citation.] Thus, whether or not the
court faithfully delivers section 1016.5's mandated advisements,
'[t]he defendant can be expected to rely on counsel's independent
evaluation of the charges, applicable law, and evidence, and of
the risks and probable outcome of trial.' " (*In re Resendiz* (2001)
25 Cal.4th 230, 240–241, abrogated on other grounds by *Padilla
v. Kentucky* (2010) 559 U.S. 356, 370.)

The key to section 1473.7 is "the mindset of the defendant
and what he or she understood—or didn't understand—at the
time the plea was taken." (*Mejia, supra*, 36 Cal.App.5th at
p. 866.) Showing prejudicial error under section 1473.7,
subdivision (a)(1) means "demonstrating a reasonable probability
that the defendant would have rejected the plea if the defendant
had correctly understood its actual or potential immigration
consequences. When courts assess whether a petitioner has
shown that reasonable probability, they consider the totality of

14

the circumstances." (*Vivar, supra*, 11 Cal.5th at p. 529.) Factors relevant to this inquiry include appellant's ties to the United States, the importance appellant placed on avoiding deportation, appellant's priorities in seeking a plea bargain, and whether appellant had reason to believe an immigration-neutral negotiated disposition was possible. (*Id.* at pp. 529–530; *Espinoza, supra*, 14 Cal.5th at p. 320.) Also relevant are the defendant's probability of obtaining a more favorable outcome if he had rejected the plea, as well as the difference between the bargained-for term and the likely term if he were convicted at trial. These factors are not exhaustive and no single type of evidence is a prerequisite to relief. (*Espinoza,* at pp. 320–321.)

Ties to the United States are an important factor in evaluating prejudicial error under section 1473.7 because they shed light on a defendant's immigration priorities. (*Vivar, supra*, 11 Cal.5th at pp. 529–530.) When long-standing noncitizen residents of this county are accused of committing a crime, "the most devasting consequence may not be a prison sentence, but their removal and exclusion from the United States." (*Id.* at p. 516; *Lopez, supra*, 83 Cal.App.5th at p. 703; *Mejia, supra,* 36 Cal.App.5th at p. 872 [compelling evidence of prejudice where the defendant lived in the United States since he was 14 years old, and his wife and child lived here, as well as his mother and siblings].)

II.     **Standard of Review**

In *Vivar*, the California Supreme Court determined the standard of review for section 1473.7 proceedings and endorsed the independent standard of review. (*Vivar, supra*, 11 Cal.5th at p. 524.) Under independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy

the rule of law. (*Id*. at p. 527.) Independent review is not the equivalent of de novo review. (*Ibid*.) An appellate court may not simply second-guess factual findings that are based on the trial court's own observations. (*Ibid*.) Factual determinations by the trial court are given particular deference, even though courts reviewing such claims generally may reach a different conclusion from the trial court on an independent examination of the evidence even where the evidence is conflicting. (*Ibid*.) Where the facts derive entirely from written declarations and other documents, however, there is no reason to conclude the trial court has the same special purchase on the question at issue; as a practical matter, the trial court and the appellate courts are in the same position in interpreting written declarations when reviewing a cold record in a section 1473.7 proceeding. (*Vivar*, at p. 528.) It is for the appellate court to ultimately decide, based on its independent judgment, whether the facts establish prejudice under section 1473.7. (*Vivar*, at p. 528.)

III. **Analysis**

We conclude that when the trial court made its ruling on June 24, 2022, it did not have the benefit of significant caselaw that changed the analytical framework used in adjudicating motions to vacate under section 1373.7. Specifically, *Manzanilla* came down one week before the hearing. It held that counsel must advise the defendant that deportation is mandatory when, as here, that is the case.

With respect to prejudice, after the proceedings in the trial court, our Supreme Court in *Espinoza* clarified the inquiry process under section 1473.7 and emphasized that the inquiry requires consideration of the totality of the circumstances, which necessarily involves a case-by-case examination for the record.

16

The Court rejected the language in *Vivar* that objective, contemporaneous evidence is necessary to corroborate a defendant's statements. (This was the standard the People cited to the trial court in their opposition to the motion.) Instead, "no specific kind of evidence is a prerequisite to relief." (*Espinoza, supra*, 14 Cal.5th. at p. 325.)

"[S]howing prejudicial error under section 1473.7, subdivision (a)(1) means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences." (*Vivar, supra*, 11 Cal.5th at p. 529.) "Reasonable probability" does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility. (*People v. Soto* (2022) 79 Cal.App.5th 602, 610; *People v. Rodriguez* (2021) 68 Cal.App.5th 301, 324.) Indeed, reasonable probability requires reversal when there exists at least such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error affected the result. (*Soto*, at p. 610; *Rodriguez*, at p. 324.)

Lengthy ties to the United States are an important factor in evaluating prejudicial error because they shed light on a defendant immigration priorities. (*Espinoza, supra*, 14 Cal.5th at p. 321.) As our high court has stated, appellant's longstanding ties "weigh in favor of finding that he would have considered immigration consequences to be of paramount concern in deciding whether to accept a plea agreement." (*Id.* at p. 322; see also *Lopez, supra*, 83 Cal.App.5th at p. 716; *Manzanilla, supra*, 80 Cal.App.5th at p. 912 [courts noting lack of ties to country of birth as factor supporting finding of prejudice].)

Appellant's ties to the United States were lifelong. He arrived here when he was seven years old. At the time of the plea, he had been in this country 11 formative years and was still in high school. He has no known familial ties to Vietnam, the country of his birth and he has never returned to Vietnam since his departure. Appellant's three sisters and a half-brother as well as his significant other and her two children are United States citizens residing in this country.

Another consideration is whether alternative, immigration-safe dispositions were available at the time of the plea. Factors relevant to this inquiry include defendant's criminal record, the strength of the prosecution's case, the seriousness of the charges or whether the crimes involved sophistication, the district attorney's charging policies with respect to immigration consequences and the existence of comparable offenses without immigration consequences. (*Espinoza, supra*, 14 Cal.5th at p. 323; *Mejia, supra*, 36 Cal.App.5th at p. 873.)

There is no evidence that appellant has a criminal record apart from the instant conviction and a juvenile adjudication predating the instant conviction. That fact is relevant because a defendant without an extensive criminal record may persuasively contend that the prosecutor might have been willing to offer an alternative plea without immigration consequences. (*Espinoza, supra*, 14 Cal.5th at p. 324.) Also relevant is the prosecutor's willingness to deviate so far from a virtual life sentence to a six-year term in state prison. This most likely represented the prosecutor's assessment of problems of proof due to the missing prosecution witness; however, it could have been due to a willingness to give appellant a break given no prior adult criminal record, or more focus on getting a conviction rather than

18

on the length of the sentence. Whatever the reason, that the prosecutor was willing to deviate significantly from a life term to six years indicates there may have been room to negotiate an immigration-neutral disposition that may have satisfied the prosecutor's priorities, which on the day of the plea plainly did not include a life term. (*Ibid.*) Of course, because appellant's counsel did not advise him of the mandatory deportation consequence of pleading no contest, it is improbable appellant, or anyone else for that matter, focused on the notion of an alternative plea disposition.

That the offense involved little sophistication is more than obvious from the court's recall of the facts of the case. Rival gang members driving in two vehicles, vandalizing cars, chasing each other around a high school campus, yelling threats, and pointing and shooting guns indicate, as the trial court observed, "incredibly stupid" things some people do when they are 18. It was apparent that not a lot of deliberation inspired the conduct of any of these actors, including appellant.

The *Espinoza* Court's clarification of how to adjudicate section 1473.7 motions set out specific factors that neither the trial court nor counsel for the parties raised or considered. The *Espinoza* Court acknowledged the possibility of remands in future appeals (*Espinoza*, *supra*, 14 Cal.5th at pp. 325–326 ["a remand for reconsideration and the development of the record may be advisable in other cases"]) as do the People and appellant in their respective briefs. The *Espinoza* framework requires the trial court to consider the totality of the circumstances "which necessarily involves case-by-case examination of the record [citation], and no specific kind of evidence is a prerequisite to relief." (*Id.* at p. 325.) We therefore remand the matter to the

trial court to set another evidentiary hearing, using the analytical framework provided by the *Espinoza* Court.

## DISPOSITION

The order denying appellant's motion to vacate his conviction is reversed. The matter is remanded to the superior court with directions to set the matter for a new evidentiary hearing to adjudicate the issues of error and prejudice.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, P. J.

We concur:

GRIMES, J.

VIRAMONTES, J.